# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| S.M.O. on behalf of themselves and all others similarly situated, | Case No. 24-cv-01124 (JMB/JFD) |
| S.M.O., | |
| vs. | **MEMORANDUM OF LAW IN SUPPORT OF MEDICA'S MOTION TO DISMISS THE COMPLAINT** |
| Mayo Clinic; and MMSI, Inc., d/b/a Medica Health Plan Solutions, | |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

TABLE OF DOCUMENTS EMBRACED BY THE COMPLAINT ............................ 1

INTRODUCTION ................................................................................................. 2

BACKGROUND ................................................................................................... 3

    I.      S.M.O. participated in Mayo's group health plan ................................. 3

    II.     The Plan offered S.M.O. three separate "tiers" of coverage to choose from ........................................................................................ 4

    III.    S.M.O searched for mental health providers to care for her son. ....................................................................................................... 6

    IV.    S.M.O. sent her son to out-of-network care and filed claims seeking benefits .................................................................................. 8

    V.    SMO alleges a sprawling scheme to fraudulently mislead participants and underpay claims. ....................................................... 10

LEGAL STANDARDS ....................................................................................... 11

ARGUMENT ...................................................................................................... 13

    I.      S.M.O. fails to properly allege a Fraud Scheme to mislead Plan participants about their benefits. ........................................................ 13

        A.    The Fraud Scheme "sounds in fraud" and must comply with Rule 9(b)............................................................................. 13

        B.    S.M.O. fails to allege "why" Mayo and Medica would draw participants away from in-network care. ...................... 15

        C.    S.M.O. fails to allege any actual fraudulent communications in compliance with Rule 9(b). ..................... 17

    II.     S.M.O. Fails to State a RICO Claim (Count I)...................................... 19

        A.    S.M.O. fails to allege racketeering............................................... 19

B.     Even if S.M.O. had alleged fraudulent statements, she
       has not alleged a "pattern" .......................................................... 21

C.     S.M.O. fails to allege that Medica was part of a RICO
       association-in-fact "enterprise" ................................................... 22

D.     S.M.O. fails to allege that Medica "conducted" any
       enterprise ......................................................................................... 25

E.     S.M.O.'s RICO conspiracy claims also fail ................................. 27

III.   S.M.O. Fails to State Any ERISA Claims (Counts II–VII) .................. 27

A.     S.M.O.'s ERISA claim for benefits fails (Count II). ................... 27

B.     S.M.O. fails to state a claim that the SPD and EOB did
       not comply with ERISA (Count III). ............................................. 29

       1.     S.M.O. fails to allege a claim under ERISA §
              104(b). ..................................................................................... 29

       2.     S.M.O.'s SPD-based disclosure claims against
              Medica fail. ............................................................................ 30

       3.     S.M.O.'s EOB-based disclosure claims also fail. ........... 32

C.     S.M.O. fails to state a claim that Medica failed to
       provide a "full and fair" review of her appeal (Count
       V). ...................................................................................................... 33

D.     The remaining derivative ERISA counts fail (Counts IV,
       VI, and VII) ...................................................................................... 35

CONCLUSION ...................................................................................................... 37

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adedipe v. U.S. Bank*,
   2015 U.S. Dist. LEXIS 178380 (D. Minn. Dec. 29, 2015) ........................................ 36

*In re Aetna UCR Litig.*,
   2015 U.S. Dist. LEXIS 84600 (D.N.J. June 30, 2015) ........................................ 31, 34

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................ 12

*Atl. Plastic & Hand Surg., P.A. v. Anthem Blue Cross Life & Health Ins.
   Co.*,
   2018 WL 1420496 (D.N.J. Mar. 22, 2018) ................................................... 27

*Atl. Spinal Care v. Aetna*,
   2014 U.S. Dist. LEXIS 45789 (D.N.J. Mar. 31, 2014) ............................................ 32

*BCBSM, Inc. v. GS Labs, LLC*,
   2023 U.S. Dist. LEXIS 15593 (D. Minn. Jan. 30, 2023) ........................................ 17

*Brown v. J.B. Hunt Transp. Servs.*,
   586 F.3d 1079 (8th Cir. 2009) .......................................................................... 29, 32

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*,
   474 F.3d 463 (7th Cir. 2007) ................................................................................ 13

*In re Citigroup ERISA Litig.*,
   662 F.3d 128 (2d Cir. 2011) ................................................................................ 35

*Clay v. AT&T Umbrella Ben. Plan No. 3*,
   2019 U.S. Dist. LEXIS 190308 (E.D. Cal. Oct. 31, 2019) ........................................ 29

*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*,
   528 F.3d 1001 (8th Cir. 2008) .......................................................................... 19, 23

*Crest Constr. II, Inc. v. Doe*,
   660 F.3d 346 (8th Cir. 2011) ......................................................................... 14, 22, 24

*Crichton v. Golden Rule Ins. Co.*,
    576 F.3d 392 (7th Cir. 2009) ................................................................. 23

*Ehlmann v. Kaiser Found. Health Plan*,
    198 F.3d 552 (5th Cir. 2000) ................................................................. 32

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) .............................................................................. 12

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004) .................................................................. 23

*Fmc Corp. v. Holliday*,
    498 U.S. 52 (1990) .................................................................................. 3

*Forest Ambulatory Surgical Assocs., L.P. v. Ingenix, Inc.*,
    2013 U.S. Dist. LEXIS 190701 (C.D. Cal. Dec. 13, 2013) ....................... 26

*Foster v. PPG Indus.*,
    693 F.3d 1226 (10th Cir. 2012) ............................................................. 31

*Franco v. Conn. Gen. Life Ins. Co.*,
    818 F. Supp. 2d 792 (D.N.J. 2011) ........................................................ 31

*Gardner v. Starkist Co.*,
    418 F. Supp. 3d 443 (N.D. Cal. 2019) ................................................... 22

*Grasso Enters., LLC v. Express Scripts, Inc.*,
    809 F.3d 1033 (8th Cir. 2016) ............................................................... 33

*Greeley v. Fairview Health Servs.*,
    479 F.3d 612 (8th Cir. 2007) ................................................................. 30

*Green Star Energy Sols., LLC v. Edison Props., LLC*,
    2022 U.S. Dist. LEXIS 196738 (S.D.N.Y. Oct. 28, 2022) ........................ 17

*Guerrero v. FJC Sec. Servs. Inc.*,
    423 F. App'x 14 (2d Cir. 2011) .............................................................. 27

*Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*,
    819 F.3d 42 (2d Cir. 2016) ..................................................................... 33

*Heyward v. Wells Fargo Bank,*
  2020 U.S. Dist. LEXIS 257058 (M.D. Fla. Oct. 6, 2020) ............................................ 15

*Holmes v. Parade Place LLC,*
  2013 U.S. Dist. LEXIS 138645 (S.D.N.Y. Sept. 26, 2013) ....................................... 20

*Johnson v. United of Omaha Life Ins. Co.,*
  775 F.3d 983 (8th Cir. 2014) .................................................................................. 32

*Jones v. Aetna Life Ins. Co.,*
  856 F.3d 541 (8th Cir. 2017) .................................................................................. 36

*Katzman v. Victoria's Secret Catalogue,*
  167 F.R.D. 649 (S.D.N.Y. 1996) ............................................................................. 20

*Koons v. Aventis Pharms., Inc.,*
  367 F.3d 768 (8th Cir. 2004) .................................................................................. 30

*Lanpher v. Metro Life Ins. Co.,*
  50 F. Supp. 3d 1122 (D. Minn. 2014) ....................................................................... 37

*LD v. United Behavioral Health,*
  2020 U.S. Dist. LEXIS 155224 (N.D. Cal. Aug. 26, 2020) ............................... 25, 32

*Levin v. Credit Suisse, Inc.,*
  2013 U.S. Dist. LEXIS 49820 (S.D.N.Y. Mar. 18, 2013) ........................................ 30

*McDonough v. Horizon Blue Cross Blue Shield of N.J., Inc.,*
  2011 U.S. Dist. LEXIS 108903 (D.N.J. Sept. 23, 2011) ........................................ 32

*McIntyre v. Reliance Standard Life Ins. Co.,*
  972 F.3d 955 (8th Cir. 2020) .................................................................................. 32

*Meiners v. Wells Fargo & Co.,*
  898 F.3d 820 (8th Cir. 2018) .................................................................................... 3

*Metro. Neurosurgery v. Aetna Life Ins. Co.,*
  2023 U.S. Dist. LEXIS 143150 (D.N.J. Aug. 16, 2023) .......................................... 28

*Midwest Special Surgery, P.C. v. Anthem Ins. Cos.,*
  2010 U.S. Dist. LEXIS 16403 (E.D. Mo. Feb. 23, 2010) ....................................... 20

*In re NationsMart Corp. Sec. Litig.*,
    130 F.3d 309 (8th Cir. 1997) ................................................................. 12, 13, 19, 27

*Negron v. Cigna Health & Life Ins. Co.*,
    664 F. Supp. 3d 223 (D. Conn. 2023) ....................................................... 25

*Nelson v. Nelson*,
    2015 U.S. Dist. LEXIS 88272 (D. Minn. July 8, 2015) ............................ 21

*Nitro Distrib., Inc. v. Alticor, Inc.*,
    565 F.3d 417 (8th Cir. 2009) .................................................................... 20

*Olin v. Dakota Access, LLC*,
    910 F.3d 1072 (8th Cir. 2018) .................................................................. 13

*OmegaGenesis Corp. v. Mayo Found. for Med. Educ. & Research*,
    851 F.3d 800 (8th Cir. 2017) .............................................................. 12, 17

*Pac. Recovery Sols. v. Cigna Behavioral Health, Inc.*,
    2021 U.S. Dist. LEXIS 59779 (N.D. Cal. Mar. 29, 2021) ...................... 22, 23, 24, 25

*Pilot Life Ins. Co. v. Dedeaux*,
    481 U.S. 41 (1987) .................................................................................... 28

*Plotkin v. IP Axess Inc., Etc.*,
    407 F.3d 690 (5th Cir. 2005) .................................................................... 15

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ............................................................................ 25, 26

*Rj v. Cigna Behavioral Health*,
    2021 U.S. Dist. LEXIS 55023 (N.D. Cal. Mar. 23, 2021) ........................ 20

*Rodriguez v. Hy-Vee, Inc.*,
    2022 U.S. Dist. LEXIS 200906 (S.D. Iowa Oct. 21, 2022) ...................... 13

*Rogers v. Baxter Int'l Inc.*,
    417 F. Supp. 2d 974 (N.D. Ill. 2006) ........................................................ 14

*Ross v. Rail Car Am. Grp. Disability Income Plan*,
    285 F.3d 735 (8th Cir. 2002) .................................................................... 29

*Sanchez v. Triple-S Mgmt Corp.*,
    492 F.3d 1 (1st Cir. 2010) ................................................................. 19, 20

*Sebrite Agency, Inc. v. Platt*,
    884 F. Supp. 2d 912 (D. Minn. 2012) ........................................................ 21

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985) ............................................................................ 19

*Sgro v. Danone Waters of N. Am., Inc.*,
    532 F.3d 940 (9th Cir. 2008) ................................................................. 29

*Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*,
    607 F.3d 1029 (5th Cir. 2010) ............................................................... 15

*Singh v. NYCTL 2009-A Tr.*,
    2016 U.S. Dist. LEXIS 94738 (S.D.N.Y. July 20, 2016) ........................... 23

*Smith v. Am. Nat'l Red Cross*,
    2019 U.S. Dist. LEXIS 41505 (M.D. Fla. Feb. 21, 2019) .......................... 34

*Stitt v. Citibank, N.A.*,
    2015 U.S. Dist. LEXIS 1120 (N.D. Cal. Jan. 6, 2015) .............................. 23

*Terry A. Lambert Plumbing Inc. v. W. Sec. Bank.*
    934 F.2d 976 (8th Cir. 1991) ................................................................. 21

*Thunander v. Uponor, Inc.*,
    887 F. Supp. 2d 850 (D. Minn. 2012) ................................................. 15, 18

*United States v. Lee*,
    374 F.3d 637 (8th Cir. 2004) .............................................................. 22, 24

*In re Unitedhealth Grp. PBM Litig.*,
    2017 U.S. Dist. LEXIS 208328 (D. Minn. Dec. 19, 2017) ......................... 27

*Urban v. Comcast Corp.*,
    2008 U.S. Dist. LEXIS 87445 (E.D. Pa. Oct. 28, 2008) ............................ 14

*Varity Corp. v. Howe*,
    516 U.S. 489 (1996) ........................................................................ 11, 36

*Vigeant v. Meek,*
    953 F.3d 1022 (8th Cir. 2020) ................................................................ 14

*Wald v. SW Bell Corp. Customercare Med. Plan,*
    83 F.3d 1002 (8th Cir. 1996) ................................................................. 36

*Walter v. Drayson,*
    538 F.3d 1244 (9th Cir. 2008) ............................................................... 26

*In re WellPoint, Inc. Out-Of-Network "UCR" Rates Litig.,*
    903 F. Supp. 2d 880 (C.D. Cal. 2012) .................................................. 31

*Wesley v. Monsanto Co.,*
    710 F.2d 490 (8th Cir. 1983) ................................................................. 29

*Woodell v. Expedia Inc.,*
    2019 U.S. Dist. LEXIS 121633 (W.D. Wash. July 22, 2019) .................. 23

*York v. Wellmark, Inc.,*
    965 F.3d 633 (8th Cir. 2020) ................................................................... 4

*Zarrella v. Pac. Life Ins. Co.,*
    809 F.Supp.2d 1357 (S.D. Fla. 2011) .................................................... 14

*Zean v. Fairview Health Servs.,*
    858 F.3d 520 (8th Cir. 2017) ................................................................. 13

**Statutes and Regulations**

29 C.F.R. § 2520.102-3(j)(3) ........................................................................ 31

29 C.F.R. § 2560.503-1 ............................................................ 31, 32, 33, 34

18 U.S.C. § 24 ............................................................................................. 19

18 U.S.C. § 1027 ......................................................................................... 19

18 U.S.C. § 1035 ......................................................................................... 19

18 U.S.C. § 1341 ......................................................................................... 19

18 U.S.C. § 1343 ......................................................................................... 19

18 U.S.C. § 1961 ................................................................................... 19, 20, 22

29 U.S.C. § 1002 ................................................................................................. 3

29 U.S.C. § 1021 ............................................................................................... 11

29 U.S.C. § 1022 ......................................................................................... 11, 31

29 U.S.C. § 1132 ........................................................................................ *passim*

29 U.S.C. § 1133 ......................................................................................... 8, 33

Racketeer Influenced and Corrupt Organization Act ........................................ *passim*

**TABLE OF DOCUMENTS EMBRACED BY THE COMPLAINT**

| Document Embraced by Complaint | Abbreviation Used in Citations in Brief | Exhibit to McCabe Declaration[1] |
|---|---|---|
| External Reviewer Decision for Appealed Claims | External Reviewer Decision | Ex. A |
| Written Appeal Filed by S.M.O. for Submission to External Reviewer | External Reviewer Appeal | Ex. B |
| Explanation of Benefits for Appealed Claims | EOBs | Exs. C-E |
| Appeals to Medica for Appealed Claims | Initial Appeals | Exs. F-H |
| Medica Appeals Decision | Appeals Decision | Ex. I |
| 2022 Mayo Select Group Health Plan Benefits Booklet | Plan | Ex. J |

---

[1] For exhibits, all citations are to "Exhibit" page numbers at page bottom.

## INTRODUCTION

Plaintiff S.M.O.'s Complaint claims that her internet search did not reveal any in-network providers to treat her son's mental health issues. She imagines that this search failure is the result of a sprawling, fraudulent scheme to hide provider information and systematically underpay group health plan claims.

The Complaint, however, fails to allege the details of this scheme with the detail required by Fed. R. Civ. P. 9(b). It makes no meaningful effort to provide the "who, what, where, when and why" of the alleged fraudulent communications purportedly made by Defendant MMSI, Inc., d/b/a Medica Health Plan Solutions ("Medica"). Further, the purported scheme is simply irrational. The Complaint's allegation that Defendants Mayo Clinic ("Mayo") and Medica schemed to hide available in-network providers is entirely inconsistent with the Mayo health plan's goal of steering participants to less expensive in-network providers. Whether asserted under the guise of a RICO claim or various ERISA violations, the Complaint's economically irrational fraud allegations are woefully deficient and cannot be credited.

The RICO claim also fails because the Complaint does not meaningfully allege that Medica controlled, or was even a part of any RICO enterprise. Instead, it merely alleges that Medica preformed limited, administrative services for S.M.O.'s group health plan, which courts uniformly recognize does not state a RICO claim.

Nor do the ERISA claims state a claim for relief. Although the Complaint raises a claim for plan benefits, S.M.O. candidly admits that she has no basis to allege that she did not receive the benefits she was due. Instead, she alleges that

2

Medica failed to disclose the method used to calculate her out-of-network benefit. But courts have rejected any claim that ERISA disclosure documents must identify the precise details of how these benefits are calculated. Likewise, her claim that she personally requested this information is inadequately pled and is contradicted by the documents embraced by the Complaint.

S.M.O.'s Complaint should be dismissed with prejudice.

## BACKGROUND[2]

### I.   S.M.O. participated in Mayo's group health plan

S.M.O. and her family were participants in a group health plan (the "Plan") sponsored by Defendant Mayo. The Plan was "self-funded," meaning Mayo is ultimately responsible for paying for the health care treatments that participants such as S.M.O. received.[3] Compl. ¶ 17.

Mayo contracted with a third party, Medica, to help perform some aspects of the day-to-day Plan administration for a fee. Compl. ¶20. This included "serv[ing] as a claims administrator," whereby Medica adjudicated participants' claims seeking Plan payment for eligible medical expenses. *See* Plan 159. Medica does not, however, serve as the "plan administrator." Plan 165.[4] And again,

---

[2] This background draws only from the Complaint and documents "necessarily embraced by the pleadings," *see* Table of Documents *supra* 1, all of which the Court can consider in deciding this motion. *See, e.g., Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018).

[3] *Fmc Corp. v. Holliday*, 498 U.S. 52, 54 (1990) (noting that in a self-funded plan, the plan sponsor "does not purchase an insurance policy . . . to satisfy its obligations to its participants").

[4] ERISA requires that every plan identify an "administrator" with the responsibility to administer the plan, subject to the right to delegate that authority to third parties such as Medica. 29 U.S.C. § 1002(16)(A)(i).

Mayo, not Medica, ultimately funded all Plan benefits due to participants. *See* Plan 158.

## II.   The Plan offered S.M.O. three separate "tiers" of coverage to choose from

S.M.O alleges that "beginning in 2019" her son (also a Plan participant) needed mental health treatment.  Compl. ¶53.

To help her to find the care she needed, the Plan grouped different physicians who might treat S.M.O.'s son in three separate "tiers," each offering different levels of coverage.  Tiers 1 and 2 included a "network" of medical providers who contracted with the Plan "to offer services to plan participants at discounted contract prices."[5]  Plan 156.  *See also* Compl. ¶¶21–22.  Tier 1 featured Mayo doctors and health care providers.  Plan 156.  Tier 2 included a larger network of non-Mayo medical providers that contracted with the Plan.  *Id*.  Tier 3 generally allowed participants the opportunity to receive care from "out-of-network" or "non-network" providers—physicians with whom the Plan did not have an established contractual relationship.  Compl. ¶¶21–23; Plan 157.

To take advantage of the discounted prices offered by in-network providers, the Plan incentivized S.M.O. to choose Tier 1 or Tier 2 by offering her reduced deductibles, coinsurance, and copays.  *See* Plan 23 ("Be aware that if you use Tier 3 medical benefits, you will likely have to pay much more than if you use Tier 2 medical benefits.").  Mayo's own providers were obviously the most economical, so the Plan allowed S.M.O. to receive care from Tier 1 providers at the lowest cost, requiring only a base deductible of $1,000 per covered person or $2,000 per family,

---

[5] *York v. Wellmark, Inc.*, 965 F.3d 633, 641–42 (8th Cir. 2020) (explaining healthcare networks).

and an out-of-pocket annual maximum of $4,000 per covered person or $8,000 per family.  Plan 31.  Tier 2 required slightly higher base deductibles of $1,750 per person or $3,500 per family and out-of-pocket maximums of $5,000 per person or $10,000 per family.  *Id*.  Consistent with the Plan's goal of incentivizing participants to receive in-network care, Tier 3 coverage was the most expensive for participants, with base deductibles of $2,200 per person or $4,400 per family and out-of-pocket maximums of $6,000 per person or $12,000 per family.  Plan 31.[6]

In addition to higher out-of-pocket payments, selecting non-network providers also could result in S.M.O. being subject to "balance billing," which occurs when the provider bills the patient for the difference between the provider's charges and the amount that the Plan pays.

More specifically because the Plan did not have contracts with non-network providers, it had no way of controlling what those providers would bill for particular services.  To ensure that non-network providers' billed charges were in line with community rates, the Plan limited the base amount that it would reimburse non-network providers.  Referred to as the "[n]on-network provider reimbursement amount" (or "NNPRA"), the Plan retained the discretion to calculate the NNPRA using one of five different formulas, including (for example) using the formula that Medicare pays for similar services in the geographic area.[7]

---

[6] Copayment and coinsurance amounts vary based on the specific benefit, but generally track the same pattern of increasing participants' out-of-pocket costs for non-network services. Plan 31, *see also e.g., id.* at 37-44.

[7] Other potential reimbursement rates include: (1) A percentage of the provider's billed charges; (2) The prevailing reimbursement rate for similar services in the geographic area; (3) An agreement with the non-network provider; or (4)

If the particular non-network provider's billed charges exceed the NNPRA, then participants like S.M.O. could be responsible for the amount that exceeds the NNPRA, in addition to copays, coinsurance, and deductibles required by the Plan for Tier 3 providers. The Plan prominently informed S.M.O. about this risk, telling her that "[o]ut-of-network providers may bill you for costs above the non-network provider reimbursement amount." Plan 23, 25. *See also id* at 156–57 (noting that a participant is "responsible for paying the difference" between the NNPRA paid by the Plan and the amount billed).[8]

In contrast, the Plan explicitly precluded in-network providers from balance billing participants like S.M.O. Plan 156–57. Thus, if S.M.O. received care from in-network providers, she would only be responsible for paying her deductible, coinsurance, or copay—yet another incentive for S.M.O. to receive in-network care. *Id*.

### III. S.M.O searched for mental health providers to care for her son.

The Complaint alleges that in 2019, S.M.O. started to search for in-network mental health providers to provide care for her son. Compl. ¶53. Consistent with its goal to encourage in-network treatments, the Plan offered her various tools to search for in-network care.

For example, as alleged in the Complaint, the Plan (through Medica) offered an online search portal (the "Provider Search Tool") to search for in-network care.

---

Requirements of the No Surprises Act of 2020 (if applicable). *See* Compl. ¶28; Plan 163.

[8] Mental health benefits under the Plan are somewhat different because the Plan only requires participants to pay deductibles, coinsurance, and co-pays at the Tier 2 level, but participants are still subject to balance billing. Plan 163.

*See* Compl. ¶47. Through this portal, S.M.O. could search for in-network providers based on several search criteria, including the providers' specialty and location. *Id.* S.M.O. alleges that she used the Provider Search Tool to look for in-network providers to treat her son's mental health conditions by searching the phrase "Pediatric mental health." *Id.* ¶¶53–54. She claims that her search did not identify any in-network providers. *Id.*

S.M.O. does not allege that she took advantage of any of the other numerous Plan options to identify in-network providers. For example, the Plan allowed participants to request a physical copy of a list of in-network physicians online or by phone (Plan 163), which S.M.O. never alleges she did. The Plan also repeatedly advised S.M.O. to contact Medica Customer Service if she had trouble finding an in-network provider. *E.g.*, Plan 2–3, 20, 164. Once again, S.M.O. alleges no such call. Even the Provider Search Tool offered her additional options. The screenshots S.M.O. attaches to the Complaint show there was a link she could use to seek "help," (Compl. ¶54), and the website included a link called the "Mayo Clinic Employee care options page" that would allow her to "see additional network options." *Id.* ¶66. S.M.O. does not allege she used these resources. *Id.* ¶¶55–56.

The Complaint alleges the Provider Search Tool was "suddenly" fixed in 2023. *Id.* ¶66. But a careful look at the Complaint's "updated" search shows it was just a different search. S.M.O.'s original alleged search was for "Pediatric mental health." The second alleged search was just for "Mental Health" providers more generally. *Compare* Compl. ¶54, *with id.* ¶66. She acknowledges that this updated

search resulted in numerous in-network providers who offered the care she was looking for.  *Id.* ¶66.

## IV.   **S.M.O. sent her son to out-of-network care and filed claims seeking benefits.**

S.M.O. alleges that because her search for "Pediatric mental health" did not generate any results, she sent her son to a non-network provider.  *Id.* ¶¶55–56.  She allegedly expected that because she could not identify any in-network providers via the Provider Search Tool, this care would be covered at in-network rates.  *Id.* ¶¶ 72–75.

The Plan did, in fact, offer expanded coverage for non-network providers if no in-network provider was reasonably available.  However, S.M.O. needed to follow specific procedures to receive this coverage.  Participants were required, for example, to contact Medica Customer Service "to review if in-network benefits are available from a non-network provider."  Plan 19.[9]  Indeed, S.M.O. concedes that "prior approval" was "contractually required" for "out-of-network providers" (Compl. ¶51), yet S.M.O. did not allege she sought or received such approval. Instead, she apparently unilaterally sent her son to seek mental health treatment at a non-network mental health provider.  *See id.* ¶¶55–56.

After directly paying her son's provider, S.M.O. filed several claims seeking reimbursement for these payments.  *Id.* ¶57.  Consistent with the Plan's review procedure and ERISA Section 503,[10] during this process, S.M.O. filed initial claims for reimbursement, which Medica responded to with an "explanation of benefits" form ("EOB") that identified the amount that she would be reimbursed for the

---

[9] *See also id.* at 22–23.

[10] *See* Plan 141–55; 29 U.S.C. § 1133,

non-network care.  Compl. ¶¶36, 59–60; *see also generally* EOBs.  Dissatisfied with the result, she filed multiple appeals (*see generally* Initial Appeals), which Medica then denied in a consolidated appeal decision.  Compl. ¶¶62–63; *see generally* Appeals Decision.  She then requested that these claims be reviewed by an external reviewer—Medical Review Institute of America, LLC (the "External Reviewer")—not affiliated with Medica or Mayo.  Compl. ¶68; *see generally* External Reviewer Appeal.  The External Reviewer denied her appeal as well.  Compl. ¶68; External Reviewer Decision.

As reflected in documents embraced by the Complaint,[11] S.M.O. grossly mischaracterizes the issues she raised during this administrative process.  She repeatedly claims she "specifically ask[ed] Defendants to identify which NNPRA Pricing Method was used" and claims she was "denied access" to materials and information related to the NNPRA.  Compl. ¶¶62–65, 68, 70.  Yet the appeals and External Reviewer records—documents the Complaint references and quotes[12]—demonstrate she *never requested this information.  See* Initial Appeals, Exs. F at 2, G at 2-3, H at 2-3; External Reviewer Appeal 3-6.

More specifically, the multiple appeals S.M.O. filed in March 2023, and in the materials she provided to the External Reviewer, S.M.O. claimed she was unable to find in-network pediatric mental health services through the Provider Search Tool, criticized the timing of Medica's claim adjudications, asserted a violation of the Mental Health Parity Act, and generally demanded that her out-

---

[11] *Infra* 12–13 (noting that a court should reject allegations in a complaint inconsistent with the documents incorporated therein).

[12] *Compare* Compl. ¶¶63–65, 68–70, *with* Appeals Decision 1–2; External Reviewer Decision 3–5.

of-network care be processed at in-network rates.  *See generally* Initial Appeals Exs. F at 2, G at 2-3, H at 2-3; External Reviewer Appeal 3-6.  Nowhere in her appeals to Medica or the External Reviewer, however, did S.M.O. challenge or request information about how the NNPRA was calculated.  *Id.*  In responding to these various appeals, Medica and the External Reviewer addressed the specific concerns raised and concluded that the claims were correctly processed.  *See generally* Appeals Decision 1–2; External Reviewer Decision 3–5.  But unsurprisingly, neither Medica nor the External Reviewer provided detailed information about how the NNPRA was calculated because, the issue was not raised by S.M.O. in the appeal.  *Id*.

## V.   SMO alleges a sprawling scheme to fraudulently mislead participants and underpay claims.

S.M.O.'s Complaint alleges a sprawling fraud scheme (the "Fraud Scheme") in which Medica and Mayo purportedly worked together to defraud Plan participants by (1) misleading participants into believing that there were no available in-network providers, (2) fraudulently keeping participants in the dark about the NNPRA, which (3) caused participants to select out-of-network providers, thinking that they would be reimbursed at in-network rates, but (4) when the claim was submitted, the participants received a lower reimbursement rate because there were in-network providers available.  *See generally* Compl. ¶¶1–9.[13]

---

[13] *See, id.* ¶31 ("misleading"); *id.* ¶74 ("failed to disclose material information,"); *id.* ¶80 ("materially false information"); ¶97 ("falsely informs participants"); *id.* ¶105 ("false representations"); *id.* ¶117 ("countless and nearly constant acts of mail and wire fraud").  *See also e.g.,* ¶¶118, 134, 143, 151, 155, 163.

Based upon this alleged fraudulent scheme, S.M.O. asserts seven separate causes of action.

In Count I, she alleges that through this Fraud Scheme, Medica and Mayo operating jointly as an "association-in-fact" enterprise violated the Racketeer Influenced and Corrupt Organization Act ("RICO"). *Id.* ¶¶86–126.

The remaining six claims are all raised under ERISA:

Count II alleges that Medica "underpai[d]" S.M.O.'s claim in violation of Plan terms and in violation of ERISA § 502(a)(1)(B). Compl. ¶¶127–140.

Counts III and V allege that Medica violated its duty to properly and timely disclose information to S.M.O. Count III alleges that Medica failed to provide proper and complete EOBs and that the Summary Plan Description ("SPD")[14] for the Plan was deficient because neither identified specifically how the NNPRA was calculated. *Id.* ¶¶141–144. Count V alleges that Medica violated its obligation under ERISA § 503 to provide a "full and fair" review of S.M.O.'s appeal by failing to disclose the "NNPRA Pricing Method" and failing to make other unidentified "necessary disclosures." *Id.* ¶¶158–164.

Counts IV, VI and VII are all derivative claims, which seek additional relief based upon same alleged underpayment and disclosures issues identified in Count II, III, and V. *Id.* ¶¶145–157, 165–187.

### LEGAL STANDARDS

---

[14] ERISA requires that employee benefit plans furnish a "summary plan description," which "must describe, among other things, the plan's requirements governing eligibility for participation and benefits as well as the procedures for presenting claims for benefits." *Varity Corp. v. Howe*, 516 U.S. 489, 531 n.10 (1996); *see* 29 U.S.C. §§ 1021(a), 1022.

This motion to dismiss rests on two grounds:  failure to plead fraud with particularity under Rule 9(b) and failure to state a claim under Rule 12(b)(6).

**Rule 9(b) Standard:**  Federal Rule of Civil Procedure 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Accordingly, a plaintiff must allege the "who, what, when, where and how surrounding the alleged fraud."  *OmegaGenesis Corp. v. Mayo Found. for Med. Educ. & Research*, 851 F.3d 800, 804 (8th Cir. 2017).  Where allegations of fraud do not satisfy Rule 9(b), those allegations should be "stripped from the claim," with the court then determining whether the remaining allegations state a claim under Rule 8.  *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 315 (8th Cir. 1997).

**Rule 12(b)(6) Standard:**  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Recognizing the cost and burden of ERISA litigation, the Supreme Court has stressed that Rule 12(b)(6) motions are an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  Accordingly, lower courts must engage in "careful, context-sensitive scrutiny" of allegations to "divide the plausible sheep from the meritless goats." *Id.*

Under either standard, where, as here, documents referenced in the Complaint "contradict the Complaint, the [documents] trump the facts or

allegations presented in the Complaint." *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 466 (7th Cir. 2007); *see also Zean v. Fairview Health Servs.*, 858 F.3d 520, 526–27 (8th Cir. 2017) (same); *Rodriguez v. Hy-Vee, Inc.*, 2022 U.S. Dist. LEXIS 200906, at *13 (S.D. Iowa Oct. 21, 2022) ("the Eighth Circuit has . . . presumed the accuracy of" "documents embraced by the pleadings").

## ARGUMENT

I.  **S.M.O. fails to properly allege a Fraud Scheme to mislead Plan participants about their benefits.**

The Fraud Scheme is an animating component of all seven counts in the Complaint.  Because the Complaint does not allege this Fraud Scheme with the particularity required by Fed. R. Civ. P. 9(b), these allegations must be "stripped from" the Complaint.  *In re NationsMart Corp. Sec. Litig.*, 130 F.3d at 315.  As discussed *infra*, absent such allegations, Count I fails to allege any RICO claim and thus must be dismissed on that basis alone.  *Infra* 19–27.  Likewise, what remains of the ERISA claims without the allegations of fraud fail to state claims for relief. *Infra* 27–37.

A.  The Fraud Scheme "sounds in fraud" and must comply with Rule 9(b).

Rule 9(b)'s requirement that a party must "state with particularity the circumstances constituting fraud or mistake" applies to all "allegations" of fraud, regardless whether those allegations are part of a claim "brought under a statute that also prohibits non-fraudulent conduct."  *Olin v. Dakota Access, LLC*, 910 F.3d 1072, 1075-76 (8th Cir. 2018).  It thus unquestionably applies to claims under

RICO.[15]  *See* Compl. ¶¶86–126.  *Infra* 19–27.  And Rule 9(b) makes no exception for allegations of fraud that are offered in support of an ERISA claim.  Rather, this Court and "courts around the country . . . have applied Rule 9(b) to ERISA claims when the claims are based on an underlying fraud."  *Zarrella v. Pac. Life Ins. Co.,* 809 F.Supp.2d 1357, 1365 & n.4 (S.D. Fla. 2011) (collecting cases).  *See, e.g., Vigeant v. Meek,* 953 F.3d 1022, 1026–27 (8th Cir. 2020).

Here, there is no real dispute that the Fraud Scheme allegations in fact do allege claims that sound in fraud and must be pled consistent with Rule 9(b).  The Complaint alleges that Mayo and Medica communicated "outright false and/or misleading information" (Compl. ¶3); that they "misle[d]" participants (*id.* ¶31); that they "fail[ed] to disclose" or "concealed" information (*id.* ¶¶74, 143, 155, 163); that they provided "false" information, made "false representations," or otherwise "misrepresented" information (*id.* ¶¶80, 97, 105); and that they engaged in "countless and nearly constant acts of mail and wire fraud" (*id.* ¶117) in an "open-ended and on-going" fashion (*id.* ¶121).  These are all quintessential allegations of fraud that must be pled consistent with Rule 9(b).  *See, e.g., Vigeant,* 953 F.3d at 1026 (holding in an ERISA case that "providing inaccurate and misleading information . . . sounds in fraud").[16]

---

[15] *E.g., Crest Constr. II, Inc. v. Doe,* 660 F.3d 346, 358 (8th Cir. 2011) (dismissing RICO suit under Rule 9(b)).

[16] *See also, e.g., Urban v. Comcast Corp.*, 2008 U.S. Dist. LEXIS 87445, at *27 (E.D. Pa. Oct. 28, 2008) (alleging "affirmative intentional misrepresentations and by intentional omissions"); *Rogers v. Baxter Int'l Inc.*, 417 F. Supp. 2d 974, 984–85 (N.D. Ill. 2006) (applying Rule 9(b) to ERISA claim alleging "scheme" to "disseminate inaccurate and misleading information").

Because the Fraud Scheme is subject to Rule 9(b), S.M.O. must allege the "who, what, when, where and why" of the fraud—that is, identify exactly when the fraudulent statement was made, by whom, what the statement was, and why it was fraudulent. *Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 876 (D. Minn. 2012). The Complaint fails to satisfy this standard.

B. <u>S.M.O. fails to allege "why" Mayo and Medica would draw participants away from in-network care.</u>

Initially, the Fraud Scheme fails because S.M.O. has failed to plead "why" Mayo and Medica wanted to hide available in-network providers from S.M.O. Her entire theory of the case is directly contrary to the basic financial structure of the Plan.

Courts recognize that to plead a conspiracy to commit fraud consistent with Rule 9(b), S.M.O. must provide "precise allegations" regarding "the alleged aim of the conspiracy." *Heyward v. Wells Fargo Bank,* 2020 U.S. Dist. LEXIS 257058, at *22 (M.D. Fla. Oct. 6, 2020). *See also Shandong Yinguang Chem. Indus. Joint Stock Co. v. Potter*, 607 F.3d 1029, 1034–35 (5th Cir. 2010) (dismissing fraud claim under Rule 9(b) given failure to allege "details that would corroborate a fraudulent scheme, such as when or why" defendant acted); *Plotkin v. IP Axess Inc., Etc.*, 407 F.3d 690, 696 (5th Cir. 2005) (same).

Here, S.M.O.'s entire theory for why Mayo and Medica wanted to engage in the Fraud Scheme—to hide in-network providers to trick her into selecting out-of-network providers[17]—is simply nonsensical. The Plan's tiered structure was

---

[17] *See* Compl. ¶¶97–100 (alleging that Mayo and Medica "falsely informs members that in-network providers are not available" in order to dupe them into selecting out-of-network providers with the expectation that they would be paid at in-network rates).

designed to encourage participants to receive care from in-network physicians who agreed to reduced rates. For example, it offered participants much lower copays, coinsurance, and deductibles if they selected in-network providers. *Supra* 4–6. Further the SPD had an entire section devoted to encouraging participants to avoid visiting non-network providers, which detailed the higher costs participants would pay if they visited a non-network provider. Plan 23.

Further, S.M.O.'s suggestion that Mayo and Medica intended to trick participants by manipulating the Provider Search Tool ignores the numerous other resources available to participants to seek in-network care. For example, the Plan offered a "medical network provider directory" online or by phone. *See* Plan 163. The Plan also directed participants to contact Medica Customer Service to request information about in-network providers before seeking care. *Id*. at 2–3, 20, 164. And the Provider Search Tool itself offered additional assistance, demonstrated by the screenshots appended to the Complaint, providing an option for "help," (Compl. ¶54), and a link to the "Mayo Clinic Employee care options page" to "see additional network options." *Id*. ¶66. While S.M.O. apparently did not utilize such resources, all were freely available. In light of the multitude of resources offered to identify in-network providers, S.M.O's assertion that Mayo and Medica intended to trick participants into going out-of-network makes no sense.[18]

Thus, the Fraud Scheme's allegation that Mayo and Medica steered participants to non-network providers "would 'invert basic economic principles'"

---

[18] Further, S.M.O.'s allegation that Mayo and Medica fraudulently created an expectation she would get paid at in-network rates is inconsistent with the fact that the Plan required her to get prior approval for such additional coverage. *Supra* 8.

and thus should not be credited. *BCBSM, Inc. v. GS Labs, LLC*, 2023 U.S. Dist. LEXIS 15593, at *53–54 (D. Minn. Jan. 30, 2023). *See also id.* at 53 n.7 ("economic irrationality is a recognized ground to find a complaint's allegations implausible.").[19]

### C. S.M.O. fails to allege any actual fraudulent communications in compliance with Rule 9(b).

Beyond the fundamental incoherence of the Fraud Scheme, S.M.O. fails to allege, consistent with Rule 9(b), that Medica made any fraudulent statements to her. The Complaint alleges only two fraudulent communications: (1) the Provider Search Tool's allegedly fraudulent communication that there were no in-network providers for "Pediatric mental health," and (2) allegations that Medica offered "misleading" communications regarding the NNPRA. *E.g.*, Compl. ¶¶9, 31, 74. Neither allegation properly complies with Rule 9(b).

*First*, the allegation that Medica deliberately "provided materially false information regarding available providers" via the Provider Search Tool (Compl. ¶80; *see also id.* ¶¶3–5), fails for multiple reasons. Initially, this allegation fails under Rule 9(b) because S.M.O. does not allege "when" she conducted her searches on the Provider Search Tool. *OmegaGenesis Corp*, 851 F.3d at 804. All she alleges is an initial search at some point between 2019 and 2023, when the Provider Search Tool was "suddenly" fixed. Compl. ¶¶53, 66. More critically, she does not allege that the search results were actually fraudulent. According to the Complaint, S.M.O. initially searched for "Pediatric mental health," and was unable

---

[19] *See also Green Star Energy Sols., LLC v. Edison Props., LLC*, 2022 U.S. Dist. LEXIS 196738, at *27–28 (S.D.N.Y. Oct. 28, 2022) (dismissing allegations of a fraudulent scheme that were "economically irrational").

to identify in-network providers. *Id.* ¶54. S.M.O. alleges that the Provider Search Tool was "suddenly" updated after she "communicated their concerns" to Medica, yet the Complaint supports this allegation with a screenshot showing results for a general search for "Mental Health." *Id.* ¶66. The fact that this broader search for "Mental Health" yielded different results compared to S.M.O.'s earlier search for "Pediatric mental health" is entirely unsurprising. And of course, S.M.O.'s Provider Search Tool allegations also fail to account for the multiple other options available to her to obtain information about in-network options, which S.M.O did not access. *Supra* 6–7. At most, S.M.O. alleges that there was a glitch in the Provider Search Tool, or that she simply performed a poorly worded search. Neither possibility constitutes fraud.[20]

*Second,* S.M.O.'s allegation that Mayo and Medica deliberately concealed how the NNPRA is calculated also falls short of Rule 9(b). *See, e.g.*, Compl. ¶31 (alleging "misleading" communications about the NNPRA), ¶74 (similar). She does not identify any specific request she made to Medica to disclose the NNPRA, "when" such a request was made, to "whom" she made it (whether Mayo or Medica), "what" she specifically requested, "what" response Medica offered, or "why" such a response was fraudulent. Such generic allegations do not comply with Rule 9(b). *Thunander*, 887 F. Supp. 2d at 876. Indeed, the documents embraced by the Complaint demonstrate that, despite raising several complaints to Medica in multiple appeals, S.M.O. never sought information about the NNPRA at all. *Supra* 9–10.

---

[20] S.M.O.'s Provider Search Tool allegations also fail to account for the multiple other available resources to obtain information about in-network options. *Supra* 6–7.

All that remains in the Complaint are scattered allegations that Medica failed to properly disclose the NNPRA in violation of ERISA.  But the "failure to disclose information, without more" does not constitute a violation of the mail and wire fraud statutes.  *Sanchez v. Triple-S Mgmt Corp.*, 492 F.3d 1, 10 (1st Cir. 2010).  Regardless, S.M.O. does not plausibly allege that Medica failed to properly disclose how the NNPRA was calculated.  *See infra* 29–32.

Because S.M.O. fails to properly allege the Fraud Scheme, these allegations must be "stripped from" the Complaint.  *In re NationsMart Corp. Sec. Litig.*, 130 F.3d at 315.  The remaining allegations do not state a claim for relief under Rule 8.

## II.    S.M.O. Fails to State a RICO Claim (Count I)

To state a RICO claim, S.M.O. must plausibly allege that Medica (1) conducted the activities (2) of an enterprise, (3) through a pattern, (4) of fraudulent racketeering activity.  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *see also Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008) ("Failure to present sufficient evidence on any one element of a RICO claim means the entire claim fails.").  Each element must be established against each individual defendant. *Craig Outdoor*, 528 F.3d at 1027.  Because S.M.O. does not sufficiently allege any of these elements, her RICO claim fails.

### A.    S.M.O. fails to allege racketeering

To plead "racketeering activity," S.M.O. must allege a violation of one of the various criminal statutes listed in 18 U.S.C. § 1961(1).  She principally claims that the Fraud Scheme violated 18 U.S.C. § 1341 & 1343, which criminalize mail and wire fraud. [21]   Both of these predicate statutes require allegations that the

---

[21] Although the Complaint also references 18 U.S.C. §§ 24, 1027, and 1035, (Compl. ¶¶89, 101) none of those statutes are among the list of "predicate acts" identified

defendant(s) made knowingly false statements. *Sanchez*, 492 F.3d at 9 (noting that mail or wire fraud require "a scheme to defraud based on false pretenses").

Courts apply stringent standards for alleging mail and wire fraud "racketeering activity," which must be pled consistent with Rule 9(b). "Because the 'mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'" *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 655–58 (S.D.N.Y. 1996) (citation omitted). Further, RICO only applies to extended, coordinated fraudulent schemes between multiple parties against multiple victims—S.M.O. cannot "transform a garden variety fraud or breach of contract case into a federal RICO claim." *Holmes v. Parade Place LLC*, 2013 U.S. Dist. LEXIS 138645, at *13 (S.D.N.Y. Sept. 26, 2013). And the "failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes" under RICO. *Sanchez,* 492 F.3d at 10.

The Complaint fails under Rule 9(b) in attempting to allege Medica engaged in fraudulent racketeering activity. *See Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428-29 (8th Cir. 2009) (upholding dismissal of RICO claim where plaintiff failed to "set forth the predicate acts of mail and wire fraud with the particularity required by Rule 9(b)"); *Midwest Special Surgery, P.C. v. Anthem Ins. Cos.*, 2010 U.S. Dist. LEXIS 16403, at *25–26 (E.D. Mo. Feb. 23, 2010) (same). As noted above, the entire allegation of a Fraud Scheme fails to satisfy Rule 9(b) because it was "economically irrational." *Supra* 16–17. Further, S.M.O.'s allegations of fraud

---

in 18 U.S.C. § 1961. *See, e.g., Rj v. Cigna Behavioral Health*, 2021 U.S. Dist. LEXIS 55023, at *23 (N.D. Cal. Mar. 23, 2021).

relating to her search on the Provider Search Tool or Medica's communications regarding how the NNPRA was calculated do not satisfy Rule 9(b). *Supra* 13–19.

Because S.M.O. failed to allege any plausible fraudulent racketeering activity with particularity, her RICO claim fails.

## B. Even if S.M.O. had alleged fraudulent statements, she has not alleged a "pattern"

To satisfy the "pattern" element, S.M.O. must meet the "continuity plus relationship" test, which requires that she "allege two or more related acts of racketeering activity that 'amount to or pose a threat of continued criminal activity.'" *Sebrite Agency, Inc. v. Platt*, 884 F. Supp. 2d 912, 920 (D. Minn. 2012) (*quoting Nitro Distrib.*, 565 F.3d at 428).

To do so, S.M.O. must allege more than that she personally was the target of two allegedly fraudulent statements.  Rather "courts have been reluctant to sanction RICO claims that involve a single scheme, a single injury, and a single victim" because there is no threat of continued criminal activity. *Nelson v. Nelson*, 2015 U.S. Dist. LEXIS 88272, at *8 (D. Minn. July 8, 2015) (listing cases).  Thus courts in the Eighth Circuit have rejected RICO claims that are directed towards a single victim. *E.g., Terry A. Lambert Plumbing Inc. v. W. Sec. Bank*. 934 F.2d 976, 981 (8th Cir. 1991 (rejecting RICO claim because "this case involves, at most, a plan to defraud a single company in connection with a single set of loan agreements").

The Complaint does not satisfy this standard, as the only two allegedly fraudulent acts were both exclusively directed at S.M.O.  *E.g.,* Compl. ¶¶53, 62-63; *supra* 6–11.  Beyond conclusory allegations that Medica delivered unidentified "misrepresentations" to other participants, which the Eighth Circuit has held is not enough to satisfy the "continuity plus relationship" requirement.  S.M.O. does

not offer a single specific example of any misrepresentations that were delivered to other Plan participants *See, e.g., Crest Constr. II*, 660 F.3d at 356-58 (holding pattern element not satisfied because "threadbare recitations of the elements of a RICO claim, 'supported by mere conclusory statements, do not suffice'" (citation omitted)).

Because S.M.O. has failed to allege a "pattern," her RICO claim fails.

C.    <u>S.M.O. fails to allege that Medica was part of a RICO association-in-fact "enterprise"</u>

S.M.O. has likewise failed to allege that Mayo and Medica engaged in an association-in-fact enterprise.[22]

In order to plead a RICO enterprise S.M.O. must plausibly allege "(1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who function as a continuing unit; and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering." *United States v. Lee*, 374 F.3d 637, 647 (8th Cir. 2004); *see also Crest Constr. II*, 660 F.3d at 354.   "Courts have uniformly held that a routine commercial dealing is insufficient to establish" an association-in-fact enterprise.  *Pac. Recovery Sols. v. Cigna Behavioral Health, Inc.,* 2021 U.S. Dist. LEXIS 59779, at *23 (N.D. Cal. Mar. 29, 2021); *see also, e.g., Gardner v. Starkist Co.*, 418 F. Supp. 3d 443, 461 (N.D. Cal. 2019)

---

[22] *See* 18 U.S.C. § 1961(4) (defining "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.").

("Simply characterizing routine commercial dealing as a RICO enterprise is not enough.").[23] S.M.O. fails to satisfy this standard.

*First*, S.M.O. has not pled a "common purpose," which requires S.M.O. to allege Medica and Mayo sought "to engage in a particular fraudulent course of conduct" *together*. *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004). A common purpose to engage in a legitimate contractual relationship (like administering a group health plan) does not suffice. *Pac. Recovery Sols.*, 2021 U.S. Dist. LEXIS 59779 at*25–26; *Crichton*, 576 F.3d at 400 (no common purpose where plaintiff alleged nothing more than a "garden-variety" contractual relationship between defendants).[24] Further, allegations that parties to a purported RICO enterprise were each "operating strictly in [their] own best interests" with "divergent goals" and without a "common purpose" is fatal to any attempt to allege an RICO enterprise. *Craig Outdoor*, 528 F.3d at 1026–27 (quotations omitted).

Here, other than boilerplate allegations, the Complaint does not allege any facts suggesting that Medica had a common fraudulent purpose with Mayo to steer participants away from in-network providers. For its part, Medica was doing nothing more that performing limited administrative services as claims administrator for the Plan. *Pac. Recovery Sols.* 2021 U.S. Dist. LEXIS 59779 at *25-

---

[23] *See also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399-400 (7th Cir. 2009) (same); *Singh v. NYCTL 2009-A Tr.*, 2016 U.S. Dist. LEXIS 94738, at *27 (S.D.N.Y. July 20, 2016) (collecting cases).

[24] *See also Woodell v. Expedia Inc.*, 2019 U.S. Dist. LEXIS 121633, at *22 (W.D. Wash. July 22, 2019) ("Where the alleged association-in-fact is formed through routine contracts for services, the 'common purpose' element is unmet"); *Stitt v. Citibank, N.A.*, 2015 U.S. Dist. LEXIS 1120, at *19–21 (N.D. Cal. Jan. 6, 2015).

26.  The Complaint does not allege that Medica had any incentive to engage in any fraudulent scheme to underpay benefits as it did not fund Plan benefits or obtain an economic benefit from denying S.M.O.'s claim.  Rather, by operating the Provider Search Tool, issuing EOBs and decisions on S.M.O.'s appeal, it was doing nothing more than performing contractually-agreed upon services.  *Pac. Recovery Sols.*, 2021 U.S. Dist. LEXIS 59779, at *23.[25]  Likewise, Mayo would not have any incentive to hide in-network providers given their lower costs.  *Supra* 4–6.  Nor does S.M.O. explain how Mayo would have a purpose to conceal how the NNPRA was calculated—or indeed, that it was even aware of S.M.O.'s claims and disputes.  In short, all the Complaint alleges is that Medica administered the Plan for a fee, pursuant to its contract with Mayo.  This is not a RICO "common purpose."

*Second,* with respect to elements (2) and (3), S.M.O. fails to allege that Medica and Mayo formed "an ongoing organization with members who function as a continuing unit" or that there was an "ascertainable structure."  *Lee*, 374 F.3d at 647.  To do so, S.M.O. must allege an organization and structure that would still exist if "the [fraudulent] acts [were] removed from the equation."  *Crest Constr. II, Inc.*, 660 F.3d at 354–55.  Yet, apart from (insufficiently pled) fraudulent acts, all the Complaint offers are allegations that Medica performed administrative services pursuant to a contract—operating the Provider Search Tool, adjudicating claims, and paying benefits.  Once again, S.M.O. cannot demonstrate a RICO

---

[25] Paragraph 106 includes a brief reference to a "kick-back" scheme, but of course such threadbare allegations cannot survive a motion to dismiss.  *Crest Constr. II*, 660 F.3d at 356 (holding general "ongoing scheme," "pattern of racketeering," and "participation in a fraudulent scheme," allegations insufficient to state RICO claim).

enterprise simply by alleging such a contractually defined relationship. *E.g.*, *Negron v. Cigna Health & Life Ins. Co.*, 664 F. Supp. 3d 223, 231 (D. Conn. 2023). Apart from this, the Complaint offers no further allegation that Medica and Mayo formed a "continuing unit' or had an "ascertainable structure," which is fatal to the RICO claim.

For just these reasons, courts have dismissed RICO claims alleging that claims administrators conspired to manipulate out-of-network reimbursement amounts. For example, in *Pacific Recovery Solutions*, the Court dismissed similar RICO claims against CIGNA, alleging that it conspired with a third party to manipulate out-of-network reimbursement rates. 2021 U.S. Dist. LEXIS 59779, at *23–26. The Court concluded that the claims failed because the complaint only alleged a "run-of-the-mill business relationship" where both parties operated according a contractual relationship. *Id.* Absent some concrete allegation that the two parties colluded or conspired to fraudulently manipulate reimbursement rates, a RICO claim fails. *Id. See also LD v. United Behavioral Health,* 2020 U.S. Dist. LEXIS 155224, at *22–31 (N.D. Cal. Aug. 26, 2020) (dismissing RICO claims against third party administrator for group health plan). Because the Complaint does not make this allegation, the RICO claim should be dismissed.

> D.   S.M.O. fails to allege that Medica "conducted" any enterprise

Even if S.M.O. plausibly pled an association in fact enterprise between Medica and Mayo, she fails to allege that Medica conducted this enterprise.

Liability for participating in a RICO enterprise extends only to those who "conduct" the enterprise—that is, those who "have some part in directing [the enterprise's] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). This requires more than being "'part' of an enterprise without having a role in its management

and operation" or "[s]imply performing services for the enterprise." *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008). Arm's-length business dealings with an alleged enterprise do not satisfy the "operation or management" test because "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs." *Reves*, 507 U.S. at 185 (emphases in original).

Just as above, S.M.O. has not alleged that Medica did anything other than perform limited, contractually-defined administrative services for Mayo and the Plan. Compl. ¶20 (describing Medica's "administrative service agreement"). Beyond performing contractual services, the Complaint does not allege that Medica exercised any authority over the alleged enterprise, by for example alleging Medica exerted "control" over Mayo or any other party. That is fatal to S.M.O.'s RICO claim.

Again, courts have rejected similar RICO claims against third party administrators on this basis. For example, in *Forest Ambulatory Surgical Assocs., L.P. v. Ingenix, Inc.*, the court dismissed RICO claims alleging a third-party administrator conspired with others to manipulate several group health plan's out-of-network reimbursement methodology, as allegations the defendant "promoted . . . flawed reimbursement methodologies" for out-of-network benefit at best showed the defendant had a "business relationship" with the other defendants. 2013 U.S. Dist. LEXIS 190701, at *16–23 (C.D. Cal. Dec. 13, 2013) (collecting cases). Even if that activity enabled the other parties to the alleged conspiracy to underpay plan benefits, that does not show a plan's administrator "directed or controlled" the enterprise. *Id*.

E.   S.M.O.'s RICO conspiracy claims also fail

Finally, S.M.O.'s vague references to a RICO conspiracy fail.  Compl. ¶114.

Absent an actual RICO claim, S.M.O. cannot state a claim for a RICO conspiracy.

*See, e.g.*, *In re Unitedhealth Grp. PBM Litig.*, 2017 U.S. Dist. LEXIS 208328, at *53 (D.

Minn. Dec. 19, 2017).

## III.   **S.M.O. Fails to State Any ERISA Claims (Counts II–VII)**

S.M.O. asserts six causes of action under ERSIA.  *See* Compl. ¶¶127–87.

Once S.M.O.'s deficient Fraud Scheme allegations are "stripped from" the

Complaint as required by Eighth Circuit law, *In re NationsMart Corp. Sec. Litig.*, 130

F.3d at 315, all that remains in the ERISA claims are allegations of "underpaid"

Plan benefits (Count II) and that the NNPRA was not adequately disclosed in the

SPD, EOBs, and appeals (Count III & V), and derivative ERISA claims based on

the same allegations (Counts IV, VI, and VII).  All those claims fail.

A.   S.M.O.'s ERISA claim for benefits fails (Count II).

To state a claim for benefits under ERISA, S.M.O. must plausibly allege facts

showing that there are "benefits due" to her "under the terms of" the Plan.  *See* 29

U.S.C. § 1132(a)(1)(B).  This requires, at minimum, that she identify a Plan benefit

she is entitled to receive and then plausibly allege that she did not receive it.  *See,*

*e.g.*, *Guerrero v. FJC Sec. Servs. Inc.*, 423 F. App'x 14, 16–17 (2d Cir. 2011) (affirming

dismissal because plaintiff "did not identify anything in the plans [] that entitled

him to a particular benefit he sought to enforce").[26]  In the context of out-of-

network benefits, S.M.O. must "point to [a] Plan provision from which the Court

can infer that Plaintiff was entitled to" a higher "amount of reimbursement" for

---

[26] *See also Atl. Plastic & Hand Surg., P.A. v. Anthem Blue Cross Life & Health Ins. Co.*, 2018 WL 1420496, at *10 (D.N.J. Mar. 22, 2018) (same).

the "out-of-network" services.  *Metro. Neurosurgery v. Aetna Life Ins. Co.*, 2023 U.S. Dist. LEXIS 143150, at *9 (D.N.J. Aug. 16, 2023).

Plainly, S.M.O. cannot satisfy this standard by repeatedly alleging that she was "underpaid," without more.  *E.g.*, Compl. ¶8 ("underpaid")[27]; *see also Metro. Neurosurgery*, 2023 U.S. Dist. LEXIS 143150, at *9.

S.M.O. fails to offer any non-conclusory allegation plausibly suggesting that she received anything less than what she was entitled to under the Plan.  Rather, she admits that the Plan reimburses for out-of-network mental healthcare services at the NNPRA, and that no statute or regulation mandates that the NNPRA be set at any level.  *See* Compl. ¶¶27–28.  And she admits that the Plan did in fact reimburse her at NNPRA after her "child received treatment from various out-of-network mental healthcare providers."  *Id.* ¶56; *see also id.* ¶49.

S.M.O. does not claim that the Plan should have used a different method to reimburse for her son's out-of-network treatment.  Nor does she claim that Mayo or Medica improperly calculated the NNPRA.  Indeed, she candidly admits that she has no idea "how the NNPRA was calculated."  *Id.* ¶39.  S.M.O. therefore has not alleged facts showing that there are additional "benefits due" to her "under the terms of" the Plan. *See* 29 U.S.C. § 1132(a)(1)(B).[28]

Count II thus fails.

---

[27] *See also id.* ¶¶1, 21, 72, 77, 80, 103, 132, 137, 139 (same).

[28] Any assertion that Medica "failed to comply with applicable state laws" when processing S.M.O.'s claim for benefits (Compl. ¶133), is preempted by ERISA Section 514, which "undoubtedly" preempts state law "causes of action . . . based on alleged improper processing of a claim for benefits."  *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 48 (1987).

**B.**  S.M.O. fails to state a claim that the SPD and EOB did not comply with ERISA (Count III).

Count III alleges (1) Medica failed to respond to a request for plan documents under ERISA § 104(b), and (2) the Plan's SPD and EOBs did not adequately disclose the NNPRA.  *See* Compl. ¶¶141–44.[29]  These claims fail.

> 1.  *S.M.O. fails to allege a claim under ERISA § 104(b).*

ERISA § 104(b) (in combination with ERISA § 502(c)) allows a participant to make a written request for certain plan documents, and to recover penalties if they are not timely provided.  29 U.S.C. 1132(c).  S.M.O. however, does not allege she made any written requests for Plan documents, so she has no cause of action under § 104(b) (or § 502(c)).  *See Wesley v. Monsanto Co.*, 710 F.2d 490, 491 (8th Cir. 1983) (denying § 1132(c) claim "because [plaintiff] had not requested a copy of [her] plan," so "she could not recover damages for [defendant's] failure to provide a copy").[30]

Even if S.M.O. had made such allegations, a claim under ERISA § 104(b) can only be asserted against the formal "plan administrator."  *See Brown v. J.B. Hunt Transp. Servs.*, 586 F.3d 1079, 1088 (8th Cir. 2009) (affirming dismissal of claims against claims administrator "because § 1132(c) only provides a cause of action against plan administrators"); *Ross v. Rail Car Am. Grp. Disability Income Plan*, 285 F.3d 735, 743–44 (8th Cir. 2002) (same).  Here, the Plan is clear that Medica is *not*

---

[29] *See also e.g.,* Compl. ¶154 (Count IV, "noncompliant EOBs").

[30] *See also, e.g., Sgro v. Danone Waters of N. Am., Inc.*, 532 F.3d 940, 945 (9th Cir. 2008); *Clay v. AT&T Umbrella Ben. Plan No. 3*, 2019 U.S. Dist. LEXIS 190308, at *14 (E.D. Cal. Oct. 31, 2019).

the plan administrator. Plan 165.[31] This is fatal to any claim that S.M.O. might have against Medica under ERISA § 104(b).

2.    *S.M.O.'s SPD-based disclosure claims against Medica fail.*

The allegations against Medica for the alleged failure to disclose the precise formula used to calculate the NNPRA in the Plan's SPD fails for multiple, independent reasons.

*First*, S.M.O. never alleges that *Medica* was responsible for creating or disseminating the SPD. That is fatal to S.M.O's SPD-based disclosure claim. *See, e.g.*, *Levin v. Credit Suisse, Inc.*, 2013 U.S. Dist. LEXIS 49820, at *11 (S.D.N.Y. Mar. 18, 2013) ("Metlife was not a fiduciary for purposes of the conduct complained of in this claim: namely, drafting and disseminating the SPD.").

*Second*, S.M.O. fails to plausibly plead that she relied on the SPD to her detriment or otherwise suffered harm as a result of the faulty SPD, which is required to claim there was a "faulty SPD." *Greeley v. Fairview Health Servs.*, 479 F.3d 612, 614 (8th Cir. 2007) ("[i]n order for an employee to recover . . . for a faulty SPD," the Eighth Circuit "requires the employee to show [s]he relied on its terms to his detriment"); *see also Koons v. Aventis Pharms., Inc.*, 367 F.3d 768, 776 (8th Cir. 2004). Here, S.M.O. does not allege that she even read the SPD, let alone that she detrimentally relied on it or that any disclosure failure caused her any harm. That mandates dismissal of the SPD claim.

*Third*, and most critically, the SPD's disclosure of the NNPRA fully complied with ERISA. ERISA § 102 addresses what an SPD must include, and lists

---

[31] The SPD trumps S.M.O.'s conclusory allegation that Medica was the plan administrator. *Compare* Compl. ¶159, *with* Plan 165. *Supra* 12–13.

thirteen specific pieces of information, none of which involves information concerning out-of-network rates, methodologies, or calculations.  29 U.S.C. § 1022. The implementing regulations likewise do not require (or even mention) the disclosure of out-of-network rates, methodologies, or calculations. *See* 29 C.F.R. § 2520.102-3(j)(3). While SPDs must provide certain information about plan benefits, courts recognize that SPDs are by their nature summaries—hence the name "summary plan description"—and need not provide detailed information about every available plan term. *See, e.g.*, *Foster v. PPG Indus.*, 693 F.3d 1226, 1238 (10th Cir. 2012) (SPDs "need not be exhaustive").

For all these reasons, courts regularly hold that an SPD need not include detailed information about the methodology for calculating out-of-network reimbursement rates.[32]  *See, e.g.*, *Franco v. Conn. Gen. Life Ins. Co.*, 818 F. Supp. 2d 792, 821–23 (D.N.J. 2011) *rev'd on other grounds*, 647 Fed. Appx. 76 (3d Cir. 2016); *In re Aetna UCR Litig.*, 2015 U.S. Dist. LEXIS 84600, at *44–48 (D.N.J. June 30, 2015); *In re WellPoint, Inc. Out-Of-Network "UCR" Rates Litig.*, 903 F. Supp. 2d 880, 921–22 (C.D. Cal. 2012). For example, in *Franco*, the court dismissed the plaintiff's claim that an SPD did not disclose the "methodology" for "calculating the amount owed to the participant or beneficiary on an [out of network] claim."  818 F. Supp. 2d at 821–23.  There, like here, the SPD disclosed that out-of-network reimbursement would be calculated in multiple potential methods, and the court found no basis

---

[32] S.M.O. had the right to Plan documents or for documents "relevant" to the claim that would have more fully identified the NNPRA (29 C.F.R. § 2560.503-1(g)(vii)(D)), but as discussed above she did not exercise this right.  *Supra* 9–10.

in ERISA to require the SPD to disclose the specifics of how the out-of-network reimbursement amount was calculated.  *Id.*

       3.   *S.M.O.'s EOB-based disclosure claims also fail.*

The EOBs also properly disclosed everything that needed to be disclosed about the NNPRA.

Just as with the SPD, ERISA's regulations define what must be listed in an EOB.  They do not require disclosure of the methodology for calculating out-of-network benefits.  *See* 29 C.F.R. § 2560.503–1(g)).  Courts therefore routinely dismiss claims challenging EOBs that did not disclose the out-of-network reimbursement methodology.  *See, e.g., LD*, 2020 U.S. Dist. LEXIS 155224, at *13–14; *Atl. Spinal Care v. Aetna,* 2014 U.S. Dist. LEXIS 45789, at *34 (D.N.J. Mar. 31, 2014) (concluding that EOB disclosure of out of network payment methodology "is not required"); *McDonough v. Horizon Blue Cross Blue Shield of N.J., Inc.,* 2011 U.S. Dist. LEXIS 108903, at *15–17 (D.N.J. Sept. 23, 2011); *see also Ehlmann v. Kaiser Found. Health Plan*, 198 F.3d 552, 555 (5th Cir. 2000) (refusing to "impos[e] a duty which Congress has not chosen to impose" for ERISA disclosures).

S.M.O.'s allegation that "[i]n one instance" Medica sent an EOB "three months" after it was due does not save Count III from dismissal.  Compl. ¶58. Even assuming that one EOB was late, a violation of ERISA's claim regulation procedures does not entitle S.M.O. to benefits.  *See Brown*, 586 F.3d at 1087 ("The appropriate remedy for [a] violation of [ERISA claims regulations] is not an award of benefits from this court."); *cf. McIntyre v. Reliance Standard Life Ins. Co.,* 972 F.3d 955, 963–65 (8th Cir. 2020) (missing the ERISA appeals processing deadline is not a "procedural irregularity" that removes discretion granted to plan administrator); *Johnson v. United of Omaha Life Ins. Co.,*

775 F.3d 983, 988–89 (8th Cir. 2014) (similar).   And as the Eighth Circuit has recognized, a single tardy EOB does not entitle S.M.O. to injunctive relief either. *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016).   She does not allege any sort of systemic, consistent failure by Medica to provide complaint EOBs to distinguish Eighth Circuit precedent.   Her claim thus fails.

C.   <u>S.M.O. fails to state a claim that Medica failed to provide a "full and fair" review of her appeal (Count V).</u>

In Count V, S.M.O. alleges that Medica failed to provide a "full and fair review" of S.M.O's appeal of her claim for benefits as required by ERISA § 503. Compl. ¶¶158–64.[33]   Such allegations fail.

ERISA § 503 establishes minimum procedural requirements that govern how an ERISA plan processes claims for benefits.   29 U.S.C. § 1133; *see also Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 48–49 (2d Cir. 2016). It provides, in relevant part, that "any [plan] participant whose claim for benefits has been denied" must be afforded a "full and fair review" of the decision denying the claim, "[i]n accordance with regulations of the Secretary [of the Department of Labor]."   29 U.S.C. § 1133(2).   The claims-procedure regulation for ERISA plans provides "a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination . . . and under which there will be a full and fair review of the claim and the adverse benefit determination."   29 C.F.R. § 2560.503-1(h)(1).   This standard does not require Medica to address every

---

[33] Similar allegations are included in other Counts.   *See id.* ¶134 (Count II, "Mayo and Medica's omissions and lack of disclosure"), ¶185 (Count VII, "failure to reimburse at a disclosed NNPRA rate").

conceivable issue that might possibly be raised by a claimants appeal, but only to address the actual issues the claimant raises.[34]

Of course, S.M.O.'s generalized allegations that Medica did not provide her with a "full and fair" review of her claim fail out of the gate because these allegations do not identify any specific violations of § 503 or 29 C.F.R. § 2560.503-1. *See* Compl. ¶¶158–64; *see also In re Aetna UCR Litig.,* 2015 U.S. Dist. LEXIS 84600, at *47–48 (dismissing § 503 claim for failing to allege specific violation).

Past that, S.M.O. makes only one, single concrete allegation to support her "full and fair review" claim:  Medica "fail[ed] to disclose the NNPRA Pricing Method."[35]  Compl. ¶161. She offers no specific allegations of when such a request was made or what Medica's response was.   In fact, contrary to S.M.O.'s generalized allegations, the documents embraced by the Complaint demonstrate that she did not make a request for any information about how the NNPRA was calculated during the appeal or the submission to the External Reviewer.  Rather, the entire focus of her appeal was her assertion that the Provider Search Tool failed to properly identify any in-network providers, which she claimed entitled her out-of-network benefits be covered at in-network coverage rates. *Supra* 9–10.  S.M.O.

---

[34]*See* 29 C.F.R. § 2560.503-1(h)(2)(iv) (providing that an appeal must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim"); *Smith v. Am. Nat'l Red Cross,* 2019 U.S. Dist. LEXIS 41505, at *33 (M.D. Fla. Feb. 21, 2019) ("[B]ecause Plaintiff did not request documents, records, and other information that was relevant to her claim for benefits, Liberty was not required to provide her with any documentation.")

[35] S.M.O.'s generalized assertions that Medica provided "misleading" information about the NNPRA sound in fraud and are not alleged with the specificity required by Rule 9(b).  *Supra* 13–19.

accordingly cannot claim that Medica or the External Reviewer failed to fully and fairly review the claims she actually raised, which is fatal to Count V.

> ### D.   The remaining derivative ERISA counts fail (Counts IV, VI, and VII)

Finally, S.M.O. asserts three ancillary ERISA claims for breach of fiduciary duty and for equitable relief under ERISA § 502(a)(3). These claims fail for several reasons.

*First*, these counts fail at the outset because they are derivative claims that all depend on claims that independently fail for reasons noted above. *Supra* 27–34. S.M.O. admits that Counts VI and VII are duplicative of the other ERISA claims, expressly alleging that both claims are raised "only to the extent that the Court finds that the . . . relief sought to remedy Counts III through V[I] are unavailable." *Id.* ¶¶166, 173. The same is true of Count IV, which duplicates Count II's claim for benefits. *Compare, e.g.*, Compl. ¶151 ("Mayo and Medica violated their fiduciary duties" by "making out-of-network benefit reductions and adverse benefit determinations") *with id.* ¶128 ("Mayo and Medica . . . made the benefit reductions"). Because S.M.O. has failed to adequately allege any primary ERISA claim, these derivative claims fail as well. *See In re Citigroup ERISA Litig.*, 662 F.3d 128, 145 (2d Cir. 2011) (affirming dismissal of derivative ERISA claims where primary ERISA violations were dismissed).

*Second*, Counts IV and VII both fail because they do not state independent, actionable claims against Medica. In essence, both counts claim Medica financially benefited from denying S.M.O.'s claim for benefits. In Count IV, S.M.O. alleges that Medica breached its ERISA duty of loyalty by making "benefit determinations for the purpose of saving money at the expense of" Plan participants. Compl. ¶150. Count VII similarly alleges that by failing to pay S.M.O. the benefits that

were allegedly due under the Plan, Medica received an individual "benefit" in the amount of the difference between the payment S.M.O. should have received and what she actually received, and that it would be "improper[]" or "inequitable" for Medica to retain this supposed "benefit." *Id.* ¶¶174–78. Of course S.M.O. fails to properly allege that she was improperly denied any benefit. *Supra* 27–28. Even if she had, Counts IV and VII do not state a claim against Medica, because Medica did not receive any financial gain as the result of (allegedly) failing to pay S.M.O.'s benefit. The Complaint, in fact, makes clear that Medica is not financially responsible for or affected by paying benefits. *See* Compl. ¶10 (noting Plan is "fully funded by Mayo"); *see also* Plan 158. The conclusory allegations that Medica received an impermissible benefit from denying S.M.O. claims fails as to these counts.

*Third,* Counts IV and VII should be dismissed because the relief sought under those counts is entirely duplicative of Counts II and V. Specifically, ERISA § 502(a)(3) is a "catchall" provision acting as a "safety net" for injuries that ERISA's other civil enforcement provisions do not adequately remedy. *Varity*, 516 U.S. at 511–12; *see* 29 U.S.C. § 1132(a)(3). When other ERISA provisions provide adequate relief, further equitable relief under this section is not "appropriate." *Varity*, 516 U.S. at 515; *see also Wald v. SW Bell Corp. Customercare Med. Plan*, 83 F.3d 1002, 1006 (8th Cir. 1996); *Adedipe v. U.S. Bank*, 2015 U.S. Dist. LEXIS 178380, at *17 (D. Minn. Dec. 29, 2015). *See also Jones v. Aetna Life Ins. Co.*, 856 F.3d 541, 547 (8th Cir. 2017) (requiring that "the two claims assert different theories of liability").

Here, removing conclusory allegations that Medica received an improper financial benefit, Counts IV and VII only allege that Medica failed to properly

adjudicate S.M.O.'s claim for benefits under ERISA § 502(a)(1)(B) and failed to properly disclose the method used to calculate the NNPRA. *See* Compl. ¶¶150, 174–77. These claims are duplicative of S.M.O.'s claim for benefits under ERISA § 501(a)(1)(B) in Count II and her "full and fair disclosure" claims in Count V. Therefore, Counts IV and VII cannot survive as separate claims for relief. *See, e.g.*, *Lanpher v. Metro Life Ins. Co.*, 50 F. Supp. 3d 1122, 1147–48 (D. Minn. 2014) (duplicative recovery is barred under ERISA § 502(a) "when a more specific section of the statute, such as § 1132(a)(1)(B), provides a remedy similar to what the plaintiff seeks under the equitable catchall provision, § 1132(a)(3)" (quoting *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 726 (8th Cir. 2014)).

<u>**CONCLUSION**</u>

The Court should dismiss the Complaint in its entirety with prejudice.

Dated: June 24, 2024                    DORSEY & WHITNEY LLP

By */s/ Andrew Holly*
    Andrew Holly (#308171)
    holly.andrew@dorsey.com
    Alyssa Schaefer  (#0402198)
    schaefer.alyssa@dorsey.com
    Brock Huebner (#0402698)
    huebner.brock@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

*Attorneys for Defendant MMSI, Inc.,*
*d/b/a Medica Health Plan Solutions*