# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Sherry M. Orrison, on behalf of herself and all others similarly situated, | Case No. 24-cv-01124-JMB-JFD |
| Plaintiffs, | |
| vs. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| Mayo Clinic; and MMSI, Inc., d/b/a Medica Health Plan Solutions, | |
| Defendants. | |

**TABLE OF CONTENTS**

*Page*

I.     INTRODUCTION ........................................................................................... 1

II.    PARTIES ....................................................................................................... 3

III.   JURISDICTION AND VENUE .................................................................... 3

    A.    Subject Matter Jurisdiction ................................................................. 3

    B.    Personal Jurisdiction .......................................................................... 4

    C.    Venue ................................................................................................. 4

IV.    GENERAL ALLEGATIONS ....................................................................... 4

    A.    The Defendants' Role and Responsibilities......................................... 4

    B.    Medica's Non-Network Provider Reimbursement Amount .................. 6

    C.    Medica Fails to Provide Proper Notice of Out-of-Network Reimbursement ......... 9

    D.    Medica Fails to Provide ABD Within the Timeframe Mandated by ERISA ....... 12

    E.    Defendants Provide Materially False Information Regarding Available Providers ......... 12

V.     PLAINTIFFS' ALLEGATIONS ................................................................. 14

    A.    Medica's Online Search Tool .............................................................. 14

    B.    Medica Member Advocate................................................................... 23

    C.    Mayo Human Resources Cases............................................................ 26

    D.    Complaint to Mayo's Compliance Department ..................................... 32

    E.    Explanation of Benefits Confusion...................................................... 36

    F.    Inaccurate Satisfied Amounts and Cost Summaries ............................. 42

VI.    CLASS ACTION ALLEGATIONS ............................................................. 43

VII.   CAUSES OF ACTION ...................................................................................... 47

COUNT I      47

Violations of RICO: 18 U.S.C. § 1962(c) ............................................................ 47

COUNT II     54

Claim for Underpaid Benefits Under Group Plans Governed by ERISA ......................... 54

COUNT III    56

Failure to Provide Accurate EOB and SPD and Request for Declaratory and Injunctive

   Relief ............................................................................................................. 56

COUNT IV     56

Violation of Fiduciary Duties of Loyalty and Due Care and Request for Declaratory and

   Injunctive Relief .......................................................................................... 56

COUNT V      59

Violation of Fiduciary Duties of Full and Fair Review and Request for Declaratory and

   Injunctive Relief .......................................................................................... 59

COUNT VI     60

Claim for Equitable Relief to Enjoin Acts and/or Practices ............................................ 60

COUNT VII    61

Claim for Violation of Mental Health Parity Act and Addiction Equity Act under 29

   U.S.C. § 1132(a)(3) ..................................................................................... 61

COUNT VIII   64

Claim for Violation of No Surprises Act under 29 U.S.C. § 1132(a)(3) ......................... 64

COUNT XI     66

Claim for Other Appropriate Equitable Relief .................................................................. 66

iii

JURY TRIAL DEMAND ................................................................................................ 68

## I.    INTRODUCTION

Plaintiff Sherry M. Orrison is an employee of Mayo Clinic who brings this action on behalf of herself and all other similarly situated individuals (the "Plaintiff Class") against Defendants Mayo Clinic ("Mayo") and MMSI, Inc., d/b/a Medica Health Plan Solutions ("Medica"), and alleges the following:

1.      Mayo and Medica have systematically underpaid health insurance claims made by subscribers and beneficiaries of Mayo's self-funded health care plans ("Plan" or "Plans"). Plaintiff brings this suit on behalf of herself and Plaintiff Class, in part, to recover the money Medica should have reimbursed them for their health care claims.

2.      Plaintiff and the Plaintiff Class hold or held self-funded employer-sponsored health insurance policies underwritten and issued by Mayo and, with respect to all claims for benefits, administered by Medica. Mayo and Medica forced Plaintiff and Plaintiff Class to obtain health care from licensed, accredited out-of-network providers under their health insurance policies and, subsequently, refused to properly reimburse Plaintiff and Plaintiff Class for the costs associated with these services, saddling Plaintiff and Plaintiff Class with significant, unexpected medical bills.

3.      Mayo and Medica withheld information that would have allowed eligible individuals to make informed choices regarding the health care providers from which they sought treatment under the policies they selected.

4.      For example, the provider search tool Medica offered through its online portal, and encouraged participants to use, routinely returned false and/or misleading information regarding the availability of in-network providers for covered health care services. In some instances, the search tool would show zero in-network providers available for a covered

1

treatment. In reliance on these results, Plan participants sought treatment from out-of-network providers with the rightful expectation that their insurance policy would reimburse them for the services received at a higher rate than if in-network providers were available. Mayo and Medica had different ideas. When Plan participants sought reimbursement for the cost of their treatment, Medica refused to reimburse them at the rates contemplated by their insurance policies when no in-network providers were available to provide the same services. Instead, Medica claimed in-network providers were available, despite the results from Medica's own search tool. And Medica withheld from Plan participants how Medica calculated reimbursement rates and deductibles for health care received from an out-of-network provider.

5.    Even when Medica's search tool identified available in-network providers, these providers frequently proved to be out-of-network after inquiry. Because the search tool was not updated with current information, individuals wasted seeking treatment they could not afford from out-of-network providers, which delayed or prevented treatment and care.

6.    Likewise, Mayo and Medica withheld information that would have allowed eligible individuals to make informed choices regarding the health insurance policies Mayo offered during the open enrollment period.

7.    While Mayo underwrote and issued every relevant health insurance Plan as the "Plan administrator," Medica served as the "Claims Administrator" and was responsible for determining the reimbursement rate for every claim at issue in this lawsuit.

8.    Underpayments to Plaintiff and the Plaintiff Class resulted from Defendants' inadequate administration of the Plan. Adding insult to injury, Defendants repeatedly denied Plaintiff and Class the information necessary to effectively challenge these inadequacies. By engaging in this conduct, among other acts, Defendants violated the Racketeer Influenced and

2

Corrupt Organizations Act ("RICO"), Employee Retirement Income Services Act ("ERISA"), Mental Health Parity and Addiction Equity Act ("MHPAEA"), No Surprises Act, and their fiduciary duties to Plaintiff and the Plaintiff Class.

## II.    PARTIES

10.    Plaintiff is a natural person residing in Scottsdale, Arizona. At all times relevant herein, she was an employee of Mayo and a participant in a Mayo-funded health care Plan for which Mayo served as the Plan Administrator and Medica served as the Claims Administrator.

11.    Defendant Mayo is a nonprofit organization organized under the laws of the State of Minnesota with its principal place of business at 200 First Street SW, Rochester, Minnesota, 55905.

12.    Defendant Medica is a corporation organized under the laws of the State of Minnesota with its principal place of business at 401 Carlson Parkway, Minnetonka, MN, 55305. At all times relevant herein, Medica was the designated Claims Administrator for Mayo's self-funded health care Plans.

## III.    JURISDICTION AND VENUE

**A.    Subject Matter Jurisdiction**

13.    Mayo's self-funded employer-sponsored health care Plans and Medica's duties as Claims Administrator with respect to those Plans are governed by the Employee Retirement Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001, *et seq*. Plaintiff asserts subject matter jurisdiction under 28 U.S.C. §1331 (federal question jurisdiction) and ERISA.

3

**B.    Personal Jurisdiction**

14.    This Court has personal jurisdiction over Mayo and Medica because each is a business entity organized under the laws of the State of Minnesota with its principal place of business in this District.

**C.    Venue**

15.    This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District, Defendants conduct a substantial amount of business in this District, and the Plans specify this District as the sole venue for disputes arising out of the Plans.

## IV.    GENERAL ALLEGATIONS

**A.    The Defendants' Role and Responsibilities**

16.    Mayo provides health care across the United States through various campuses and regional facilities while maintaining a cutting-edge medical research practice. In service of these endeavors, Mayo employs thousands of individuals across the country. Most of Mayo's employees are located near at least one of its campuses or regional facilities, although a substantial number work remotely, as well.

17.    At all times relevant herein, Mayo offered its employees self-funded health care Plans, each of which was a fully insured employee welfare benefits Plan under ERISA.

18.    Under self-funded employee health care plans, the employer takes on most, or all, of the costs of benefit claims. Often, the employer offering the self-funded health plan will enlist the services of a third-party insurance company to manage the day-to-day administration of the plan, such as payments to and from subscribers and beneficiaries. Under this scenario, an

4

employer pays a specific amount to the third-party insurance company each month to be set aside for, among other things, their employees' expected hospital and doctor bills for the month. Under such plans, employees seek care from doctors, hospitals, and specialists, and get prescriptions at pharmacies in their plans national or local networks. Then, the claim bill is paid directly from the monthly expected pool of money. At the end of the year, the total monthly cost set aside is reviewed against the total claims paid out. Any amount left over is typically split by the employer and the insurance company according to their arrangement. Self-funded health care plans are advertised as an opportunity for employers to manage health care costs, obtain relief from state health care requirements, and get money back at the end of the year.

19.     At all times relevant herein, Mayo served as the Plan Administrator of its self-funded health care Plans.

20.     At all times relevant herein, Medica served as the Claims Administrator of Mayo's self-funded health care Plans. In this role, Medica's responsibilities included, among other things, providing participants with Plan documents, interpreting and applying Plan terms, making coverage and benefits determinations, deciding appeals of coverage and benefits determinations, and, when necessary, reimbursing Plan participants.

21.     As the Claims Administrator, Medica was an ERISA fiduciary and maintained the authority and responsibility to make final benefits determinations based on procedures and standards Medica developed.

22.     As Plan Administrator, Mayo controls the actions of Medica in accordance with the administrative agreements. Mayo, as the Plan Administrator, issued and underwrote every health insurance Plan at issue while Medica processed claims and determined the reimbursement

rate. Mayo and Medica knowingly participated in the creation and formulation of the health Plans, Plan documents, and the search tool given to members to distribute information.

23.     Decision making among Mayo and Medica was consensual in that they functioned as a continuous unit: a link to Medica's webpage resides on Mayo's internal website; Mayo HR held itself out to provide assistance to members in dealing with issues and concerns with Medica; the IT department at Mayo hosted meetings with the intention of gathering information on any problems members were experiencing with Medica; Medica Member Advocates were provided to members who contacted Mayo HR.

**B.     Medica's Non-Network Provider Reimbursement Amount**

24.     Plaintiff and the Plaintiff Class are members of Mayo health insurance Plans, administered by Medica, that have underpaid the health services claims at issue here. All of the Plans at issue here provide for coverage of out-of-network health services. All relevant Plans in this matter covered the treatment provided to Plaintiff and the Plaintiff Class. The issue in this litigation is the underpayment of benefits.

25.     Insurance policies do not always cover services for out-of-network, noncontracting providers. Premiums for insurance plans that do provide out-of-network coverage, called Preferred Provider Organization ("PPO") plans, are substantially more expensive than Health Maintenance Organization ("HMO") or Point of Service ("POS") plans that only reimburse in-network or contracting providers.

26.     As a result, insurers utilize various methods to determine the amount the insurer will reimburse its members for out-of-network care. The methodologies used to determine reimbursement rates must be disclosed in Plan documents to allow members to make informed decisions when choosing a health insurance Plan.

27.     Many insurers use usual, customary, and reasonable ("UCR") rates to calculate reimbursement amounts. UCR rates are a fixture of the managed care payment system in the United States. When doctors, hospitals, or other healthcare providers are out of a plan network and do not have contracts with health insurance companies, the insurers must decide the rate of reimbursement for out-of-network services. Generally, private insurers claim to reimburse out-of-network providers at UCR rates.

28.     The Centers for Medicare Services defines UCR as: "The amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service."[1]

29.     The precise methodology and inputs considered in calculating UCR rates are often obscured from members, leaving members unable to adequately understand or challenge reimbursement rates that are often inconsistent, confusing, and unreasonable. As a result, many lawsuits have challenged various aspects of UCR rates.

30.     Medica goes even further to shield its reimbursement rates from scrutiny. Eschewing a common UCR methodology, Medica affords itself unilateral discretion to use one of five methods to calculate what it calls the Non-Network Provider Reimbursement Rate ("NNPRA"). Under the terms of the Plans, Medica reimburses members for the NNPRA amount, leaving members responsible for any remainder.

31.     According to Medica's own benefits information it provides to members, Medica may set the NNPRA based upon five criteria:

---

[1] Healthcare.gov "Usual Customary or Reasonable" https://www.healthcare.gov/glossary/ucr-usual-customary-and-reasonable/#:~:text=The%20amount%20paid%20for%20a,same%20or%20similar%20medical%20service. (accessed August 19, 2024).

(1)    a percentage of the amount Medicare would pay for the service in the location where the service is provided;

(2)    a percentage of the provider's billed charge;

(3)    a nationwide provider reimbursement database that considers prevailing reimbursement rates and/or marketplace charges for similar services in the geographic area in which the service is provided;

(4)    an amount agreed upon between Medica and the non-network provider; or

(5)    an amount equal to the median of Medica's network contracted rates for the same or similar services in the geographic area in which the service is provided.[2]

32.    The third methodology mirrors the UCR rates typical throughout the industry, but it is only one of five options available to Medica.

33.    Defendants' underpayment of the claims at issue here resulted in unexpected medical bills to Plaintiff and the Plaintiff Class. Plaintiff and the Plaintiff Class members were forced to pay these bills out of their own pockets.

34.    Medica fails to identify any of the criteria it considers when determining the NNPRA. The laundry list of methods Medica states it may use is misleading and provides no material information to Plaintiff and the Plaintiff Class on the exact method it uses. Medica also fails to provide Plaintiff and Plaintiff Class members advance notice of how a particular service will be reimbursed.

---

[2] These methods are collectively referred to herein as the "NNPRA Pricing Methods."

35.     Medica's NNPRA Pricing Methods are deceptive, misleading, arbitrary, illusory, unpredictable, and allow for inconsistent reimbursements, in violation of ERISA and Medica's fiduciary obligations thereunder.

36.     And when Plan members contacted Mayo for help with figuring out reimbursements, deductibles, and how the NNPRA is calculated, Mayo directed members to Medica Member Advocates and other resources that offered little guidance or assistance.

37.     Mayo and Medica agreed to utilize these structures and procedures in an effort to hide formulations and pertinent information from Plan members.

**C.      Medica Fails to Provide Proper Notice of Out-of-Network Reimbursement**

38.     Medica's Plan documents fail to state when a certain method may be used, or what factors Medica considers when deciding upon a particular method.

39.     Under ERISA, an insurer is required to provide written notice of Adverse Benefits Determinations within 30 days. Under ERISA and the CFR implementing ERISA, an Alternative Benefits Determination is defined as:

> A denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit, including any such denial, **reduction**, termination, or failure to provide or make payment that is based on a determination of a participant's or beneficiary's eligibility to participate in a plan, and including, with respect to group health plans, a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review, as well as a failure to cover an item or service for which benefits are otherwise provided because it is determined to be experimental or investigational or not medically necessary or appropriate.

29 C.F.R. § 2560.503-1(m)(4)(i) (emphasis added).

40.     An Alternative Benefits Determination must provide notice of the specific reasons for such a determination with reference to the specific provision of the Plan justifying the decision. 29 C.F.R. § 2560.503–1(g)(1).

9

41.    Medica's Alternative Benefits Determinations ("ABD") are in the form of an Explanation of Benefits ("EOB"). From this point forward, EOB and ABD are used interchangeably.

42.    Medica's EOBs fail to provide the information required by ERISA. The Medica EOB is comprised of a spreadsheet of the different fees and reimbursement amounts triggered by the care obtained. Where an NNPRA has been determined, however, Medica fails to identify which of the NNPRA Pricing Methods it utilized to determine the NNPRA. The EOBs also fail to identify which provision of the Plan was utilized to determine the NNPRA.

43.    The only clarity provided on the EOBs are "Notes ID" such as "UM-M13," meaning "[s]ervice was provided by an out-of-network provider. Your provider may bill you for amounts that exceed the plan allowed amount." Other codes included "Non-covered charge(s)" (PR-96) and "Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement" (CO-45). The image below is an example of a "Notes ID," however, each EOB contains a variety of codes, therefore they vary and are usually not exactly the same.

## Notes

| CODE | DESCRIPTION |
|---|---|
| CO-45 | Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement. |
| SM-1 | This claim is a duplicate and was previously processed. |
| PR-2 | Coinsurance Amount |
| PR-96 | Non-covered charge(s). |
| UM-M13 | Service was provided by an out-of-network provider. Your provider may bill you for amounts that exceed the plan allowed amount. |
| PR-1 | Deductible Amount |

When we receive a claim for you, we provide an Explanation of Benefits (EOB) to you and your provider. It describes how the services you received were covered. It also shows any amount you owe.

Use your EOB to review the charges on any bill you receive from your provider that is associated with this claim. If you notice differences between the EOB and your bill, contact customer service or your provider's office to get help reconciling them.

The Claim Summary Page gives you an overview of how your claim was handled, and may help you interpret the information on the following Claim Detail page. The Detail page is provided to you based on requirements established in state law.

10

44.     As a result of the lack of specificity of the EOBs, Plaintiff and Plaintiff Class members had no notice of which NNPRA Pricing Method was used, how the NNPRA was calculated, and/or whether that NNPRA would be consistently applied in the future. As a result, members lacked specifics to understand and, if necessary, appeal Medica's EOBs.

45.     Even worse, because of the inconsistent, arbitrary, and opaque application of various NNPRA Pricing Methods, Medica's members could not make informed decisions regarding their health care.

46.     Medica's lack of transparency continued throughout the appeals process. In decisions affirming their prior EOBs, Medica failed to identify how it chose to reimburse claims or deny claims entirely, which NNPRA Pricing Method it applied, how the NNPRA was calculated, and why a particular NNPRA Pricing Method was selected.

47.     The failure to identify the reimbursement structure and specific NNPRA Pricing Method violated ERISA and Defendants' fiduciary duties.

48.     When members asked how the reimbursement was calculated, why claims were denied, which NNPRA Pricing Method was utilized, and how the NNPRA was calculated, Defendants refused to provide the requested information.

49.     Upon information and belief, Medica refuses to inform members of the specific NNPRA Pricing Method used in order to obscure the fact that Medica utilizes whichever method offers the lowest reimbursement rate.

50.     And Mayo, fully aware of the lack of information provided by Medica, effectively agrees to continue this pattern of concealment, providing no assistance of its own.

11

**D.      Medica Fails to Provide ABD Within the Timeframe Mandated by ERISA**

51.      Under ERISA, an insurer must provide notice of an ABD within 30 days of the date the claim was filed. If the information provided by the member is incomplete, the ABD must be provided within 30 days of receiving all required information.

52.      Medica routinely fails to provide ABDs to Plan members within the timeframe required by law, materially impacting its members' ability to choose the medical plan best suited to their needs. Where the delay falls within the time period a member must choose their plan for the upcoming year, the delay can prevent the member from making an informed decision for the upcoming year.

53.      Mayo, fully aware that Medica was not providing ABDs within the mandated time frame, provided no assistance. Mayo sent its employees new Plan documents during open enrollment, but when members inquired about outstanding ABDs in an attempt to select a health plan best suited for them for the following year, Mayo provided no support.

54.      Mayo and Medica effectively agreed to allow late and delayed ABDs.

**E.      Defendants Provide Materially False Information Regarding Available Providers**

55.      Members of the Mayo Medical Plan were told to use the search tool found in the Medica Member Portal to determine provider options. The search tool allowed members to search for a provider using various criteria, including, among other things,  specialty, location, and, beginning in and around 2023, age of the patient.

56.      When the search tool failed to find in-network providers, members, in reliance on these results, sought treatment from out-of-network providers with the understanding that they would not be penalized by higher rates because no in-network providers were available within their geographic area.

57.     However, after members submitted claims for these services to Medica, Medica only reimbursed members at the NNPRA amount, leaving members responsible for any remaining portion. When members pointed out that the Medica's search tool did not identify any in-network providers within the geographic area, Medica responded that their system shows in-network providers within the geographic area—despite the Medica search tool returning no results.

58.     To justify charging NNPRA rates, Medica claimed that members were contractually required to call Medica to get prior approval to use an out-of-network provider.

59.     As a result, Plaintiff and Plaintiff Class were routinely charged out-of-network rates despite Medica's own search tool showing no in-network providers within their geographic area. Members were therefore forced to pay higher rates after seeking out services in reliance on information provided by Medica.

60.     Mayo was fully aware that Medica's search tool was providing incorrect information and not displaying search results properly. Medica's search tool is provided either through the Medica Member Portal, a link to which could be found on Mayo's employee-only network, or publicly through Medica.com.

61.     Mayo and Medica agreed to allow access to Medica's search tool on Medica's Member Portal and agreed to utilize a flawed search tool that effectively induced members to seek care from providers that were out of network. The control and manipulation of the search tool furthered their purpose of paying less to providers and subscribers.

62.     Mayo and Medica carelessly excluded information and failed to update the search tool with current information. This resulted in misinformation to members and often forced

13

members to utilize out-of-network providers, which, upon information and belief, enabled Mayo and Medica to reduce the costs of operating the insurance Plans by limiting their costs of care.

## V.     PLAINTIFFS' ALLEGATIONS

63.     Plaintiff Sherry M. Orrison is a longtime employee of Mayo. At all times relevant to this Complaint, she was a participant in a Mayo self-funded health care Plan, and her child was a beneficiary of the Plan.

64.     In 2019, faced with an urgent health care need, Ms. Orrison sought health care treatment for her child in and around Scottsdale, Arizona.

**Provider network**

Tier 1 medical benefits are available through the Mayo Medical Plan Tier 1 provider network. Tier 2 medical benefits are available through the Mayo Medical Plan Tier 2 provider network. To see which providers are in your plan's network, check the online search tool on Medica.com/MemberSite or contact Customer Service. Certain providers may be in other Medica networks, but not in your network.

### A.     Medica's Online Search Tool

65.     To conduct her search for an appropriate health care provider, Ms. Orrison was directed by her health care Plan documents to Medica's online search tool, which could be found at Medica.com/MemberSite. The Mayo Select Plan benefits booklet outlines the following:

66.     After her initial search in 2019 revealed no in-network mental health care providers, Ms. Orrison called Medica's customer service to inquire further, but, somehow, they were unable to answer her questions. Her child needed health care, so she set an appointment

14

with an out-of-network mental health care physician near her home who saw patients under the age of 18.

67. Between 2019 and 2023, Ms. Orrison utilized Medica's online search tool on approximately 50 separate occasions to search for an in-network mental health specialist that could treat her son, who was under the age of 18. In each instance except for the last, her search revealed no in-network providers. Ms. Orrison documented at least three such instances, which are representative of her experience between 2019 and 2023.

68. Ms. Orrison started submitting claims for reimbursement in 2019 (and continues to this day).

69. On April 13, 2021, still unable to locate a pediatric mental health care provider within 50 miles of her home, Ms. Orrison reached out to Mayo's HR department to open a "case" and inquire about "drug dependency treatment options for teenagers" that were covered under the Mayo Select Plan. Specifically, Ms. Orrison inquired about in-patient and out-patient treatment options, "Therapeutic Boarding Schools," and "Educational Consultants." In response, HR told her she could contact "Vital WorkLife . . . to inquire about drug dependency treatment options and/or log onto Medica's portal . . . and search the provider directory for this type of program." Additionally, the HR representative attached an article on Mayo's Employee Assistance Program (Mayo employees and their dependents could obtain six free therapy sessions through the Employee Assistance Program, but it was unequipped to offer the services Ms. Orrison sought, and by this point, Ms. Orrison's son had already exhausted this service). Thereafter, Ms. Orrison contacted Vital WorkLife and Mayo's Employee Assistance Program but neither could provide or help her locate drug dependency treatment options for her son. HR closed Ms. Orrison's case without follow up.

15

70.     From April 14, 2021, to June 20, 2022, Ms. Orrison took her child to several mental health providers who required payment in full at the time of service. She continued to conduct searches through Medica's search tool, but it consistently displayed zero results for pediatric mental healthcare and mental healthcare for patients under 18 years old.

71.     On February 22, 2023, Ms. Orrison conducted another search through Medica's search tool, but this time took screen shots so she could share the results with Medica and Mayo to demonstrate the apparent absence of in-network providers for pediatric mental health care and mental health care for patients under 18 years of age.

72.     The first search Mrs. Orrison conducted on February 22, 2023, filtered for "pediatric mental health" within 50 miles of her zip code. There was no filter for age. The search returned zero results.



73.     In the second search Ms. Orrison conducted on February 22, 2023, she searched specifically for any "mental health" providers within 50 miles of her zip code. That search returned three facilities, yet none of the providers at the identified facilities offered care for patients under 18 years of age.

17

74.     On February 23, 2023, Mayo held an internal meeting of its information technology department to address the "overwhelming number of questions and concerns" constituents had been raising about Medica's administration of the health care Plan. During that meeting, Cris Ross, Chief Information Officer, asked employees to email Sara Behnken, Senior IT Systems Analyst, their issues with Mayo's health insurance and Medica's administration of claims thereunder. Ms. Orrison immediately emailed Ms. Behnken to described her experience, including, among other things, (1) the lack of availability of any in-network mental health care providers for her child; (2) paying out-of-pocket and upfront for imperative mental health treatment for her child; (3) unanswered questions from HR and Medica related to reimbursing her for the mental health care her child received; (4) delays in health claim processing; and (5) lack of information before choosing a health care plan through open enrollment.

75.     On February 23, 2023, Ms. Behnken responded, "I have received many, many emails today very similar to yours. This is a huge issue that needs to be dealt with! I will compile all the questions and concerns, share it with our IT exec team and then forward onto our HR and Benefits colleagues."

76.     On February 24, 2023, Ms. Orrison's manager, Jenny Benson, reached out to Ms. Benson's HR contact, Ghulam Awan, to determine if Ms. Orrison's concerns could be escalated because she continued to incur out-of-pocket payments for her child's medical expenses.

77.     On March 14, 2023, Ms. Orrison followed up with Ms. Behnken a follow-because Ms. Behnken had yet to provide an update. Two days later, Ms. Behnken apologized for the delay and stated, again, that she would share the concerns with HR. The same day, Ms. Orrison replied: "Thank you for the update, I appreciate your help very much! I have reached out to HR directly and was working with someone from HR but it didn't end up getting my questions

answered or resolving the multiple issues that I am having." Ms. Behnken replied, "I'm sorry to hear this! We all need to keep communicating with them."

78.   On March 20, 2023, Ms. Orrison again contacted Ms. Behnken. This time, she included screenshots that demonstrated that, according to Medica's online search tool, there were no in-network pediatric mental health care providers within a reasonable distance of her home. Ms. Orrison explained:

> My search was for Mental Health as the provider specialty up to 150 miles of my zip code, 85255 (I live close to both the Mayo Hospital and Clinic in AZ). The only filter used was the patient age which in my case needed to be less than 18 years old. There literally are zero options for adolescent mental health in either tier 1 or tier 2 coverage in AZ and I am within a few miles of both the Mayo Hospital and Clinic in AZ.

**From:** Medica Member Communications <MedicaMemberComm@email-medica.com>
**Sent:** Monday, March 20, 2023 8:46 AM
**To:** Orrison, Sherry M. <█████████████████████>
**Subject:** [EXTERNAL] Explore our new member website

To view this email as a web page, go here.



### Our new digital experience is easy!

You have a new and easy way to access your Mayo Medical Plan benefits online. Explore your new member website at **Medica.com/SignIn**.

In your new member website you can:

- Download your ID card
- Access plan documents and coverage details
- Check the status of claims
- Find a provider or clinic in your network
- Quickly find answers and information specific to your medical plan

Already registered on your member website? Don't worry. We've saved all your information so look around and discover a seamless way to manage your Mayo Medical Plan administered by Medica. Call Member Services at 1 (866) 839-4015 (TTY: 711) with questions.

**Explore your member website**

19

79.    On the same day, March 20, 2023, Medica sent an email stating that there was "a new and easy way to access your Mayo Medica Plan benefits online."







80.    Ms. Orrison conducted another portal search using the link sent to her in the above email on March 24, 2023. The search tool and filters appeared updated, so Ms. Orrison once again tried to search for "mental health," using filters to narrow the results to providers who were within 150 miles of her zip code and accepted patients under 18 years of age. As before, the search identified no in-network providers for pediatric mental health care or mental health care for patients under 18 years of age.

81.    On March 23, 2023, Ms. Orrison contacted Mr. Ross and Chuck Treder, Mayo's Vice-Chair of Information Technology, via email:

> I apologize for sending you a direct email but please know that I have given sending this a lot of thought. All of my issues with Medica are directly related to mental health services that I have accessed for my son and I wasn't comfortable sharing details with various levels of management within IT.

She explained that she had been hopeful that her questions about her EOBs would be answered when she was assigned a Medica Member Advocate, but the Advocate was unable to help. She detailed her experience with the Medica Member Advocate, including an instance in February 2023 in which the Advocate's supervisor left Ms. Orrison a voicemail stating that Ms. Orrison's

21

claims were denied and closed. Then, Ms. Orrison described her broader concerns in some detail for Mr. Ross and Mr. Treder.

82.     Mr. Treder responded the same day, asking if he could share Ms. Orrison's email with HR. She immediately responded that HR was aware, but that he could share the email. On March 24, 2023, Ms. Orrison emailed Mr. Treder with screen grabs of her attempted search through the Medica search tool.

83.     On March 27, 2023, Mr. Ross emailed Ms. Orrison, "We've compiled and anonymized the feedback from our team and have shared with HR. I think HR will benefit from getting some detailed feedback about persistent issues our team is facing and I am hopeful that will lead to action with Medica and FirstHealth."

Ms. Orrison
March 31, 2023
Page 2 of 3

In your letter, you indicated that you were unable to find an in network Mental Health Providers for patients under 18 years old under the plans network.

A review of the Mayo Arizona provider network found multiple mental health providers within 25 miles of your zip code of 85255. You may lookup these providers at https://www.medica.com/find-care/select-employer-provided-plan/mayo-medical-plan. Further review showed that many of the mental health providers found were listed as a Tier 1 provider.

//

//

22

84.    On March 31, 2023, Ms. Orrison received the below letter from Medica informing her that her claims were denied because there were multiple in-network providers available.



85.    On March 31, 2023, immediately after receiving this letter, Ms. Orrison attempted the same search she attempted a week prior. She used the same search terminology, criteria, and filters, but this time, the search tool displayed multiple in-network providers of pediatric mental health care and mental health care for patients under 18 years of age in the Scottsdale area. This was the first time in four years that the search tool returned results for in-network providers in these specialties.

**B.    Medica Member Advocate**

86.    Ms. Orrison used every resource at her disposal to locate in-network providers through the Medica search tool for her child's mental health needs. When the Medica search tool returned no in-network results in the desired specialties, she communicated directly with Medica representatives for additional information.

23

87.    On November 2, 2022, Ms. Orrison called Medica's customer service to inquire about the status of claims she submitted for reimbursement of out-of-pocket payments made for her child's mental health care. Ms. Orrison did not specifically use the term "NNPRA" in her inquiry—as a layperson, she was unfamiliar at the time with the technical terminology used in the industry for calculating reimbursement rates and deductibles—but she did ask about her out-of-pocket expenses and the reasoning for Medica's decisions regarding the calculation of her deductibles and reimbursements. In effect, she was asking for information about the NNPRA, though she did not know the exact term.

88.    Medica's customer service was unable to assist her. Ms. Orrison was told that customer service could not answer her questions and that an investigation would have to take place before she could receive a call back. Ms. Orrison explained that she needed the information to determine which medical plan to select during the enrollment period for 2023, but she never received a call back.

89.    On November 11, 2022, Ms. Orrison received a letter from Medica requesting additional information regarding certain claims she submitted for reimbursement. The letter stated that she needed to submit an "individual NPI" number and a separate "facility NPI" number to process her claims. In response, Ms. Orrison called the affected health care provider to confirm that the provider billed his services using only the facility NPI number. Once confirmed, Ms. Orrison called Medica to pass along this information. In response, Medica offered Ms. Orrison no solution for this issue and simply informed her that they could not process her claims until she located the individual NPI number. Eventually, without notification—and as far as Ms. Orrison knew, without an individual NPI number—Medica began processing Ms. Orrison's claims.

24

90.     Because Medica failed to process Ms. Orrison's claims before the close of the open enrollment period for 2023—despite having about 60 days to do so—Ms. Orrison was unable to make an informed decision regarding the best health plan for her and her family in 2023.

91.     On December 2, 2022, Ms. Orrison called Medica customer service again and was verbally told that Medica could not process the claims Ms. Orrison's provider made because, this time, the provider had not presented a "diagnosis code" with the claim.

92.     On December 5, 2022, she again contacted Mayo HR to request assistance with her Medica health care claims. Ms. Orrison spoke to Jody Danielson, a Mayo employee serving as an HR representative, who subsequently requested that Mayo assign a Member Advocate to Ms. Orrison to assist her.

93.     At some point between the end of December 2022 and the beginning of January 2023, a Medica Member Advocate, Stephanie Hughes, was assigned to Ms. Orrison. Ms. Orrison left a voicemail for Ms. Hughes. Ms. Hughes responded with her own voicemail but answered no questions. Ms. Orrison left another voicemail for Ms. Hughes two days later.

94.     On January 12, 2023, Ms. Orrison still had not spoken directly to her Medica Member Advocate, so she left another voicemail asking to speak to her. Ms. Hughes called Ms. Orrison, but Ms. Hughes was unable to explain the method by which Ms. Orrison's deductibles or reimbursements were calculated, or provide any update regarding the other claims Ms. Orrison submitted. Ms. Hughes listened to Ms. Orrison and said she would call back the next day but never did.

95.     On January 17, 2023, Ms. Orrison left yet another voicemail for her Medica Member Advocate to ask for a return call.

96.     A week later, Ms. Orrison received a letter from Medica asking for additional information on her claims, including the provider NPI number (as opposed to the facility NPI number). Because Ms. Orrison received no help from her Medica Member Advocate and Ms. Orrison's questions remained unanswered, Ms. Orrison turned back to Mayo HR to request help.

97.     On February 6, 2023, Ms. Orrison received a generic voicemail from Ms. Hughes, which provided no answers to Ms. Orrison's questions.

98.     On February 9, 2023, Ms. Orrison received a voicemail from an unfamiliar name, Tyler Buys, who, it turned out, was a supervisor at Medica. He stated that none of her claims were eligible for coverage of any kind because the claims were submitted without a provider NPI number. Ms. Orrison emailed Mayo HR to express her concern that she could not remedy the situation because the mental health provider she utilized did not have a provider NPI number specific to Arizona. Ms. Orrison's additional questions regarding deductible and reimbursement calculations and the search portal were left unanswered.

99.     Ms. Orrison continued to search for answers. She asked to be assigned to a different Medica Member Advocate but was told no.

**C.     Mayo Human Resources Cases**

100.    While attempting to resolve her issues with Medica, Ms. Orrison opened cases with Mayo HR, which repeatedly held itself out as a resource for resolving Ms. Orrison's issues with her health care.

101.    On April 13, 2021, still unable to locate a pediatric mental health care provider within 50 miles of her home, Ms. Orrison reached out to Mayo's HR department to open a "case" and inquire about "drug dependency treatment options for teenagers" that were covered

26

under the Mayo Select Plan. [3] Specifically, Ms. Orrison inquired about in-patient and out-patient treatment options, "Therapeutic Boarding Schools," and "Educational Consultants." In response, HR told her she could contact "Vital WorkLife . . . to inquire about drug dependency treatment options and/or log onto Medica's portal . . . and search the provider directory for this type of program." Additionally, the HR representative attached an article on Mayo's Employee Assistance Program (Mayo employees and their dependents could obtain six free therapy sessions through the Employee Assistance Program, but it was unequipped to offer the services Ms. Orrison sought, and by this point, Ms. Orrison's son had already exhausted this service). Thereafter, Ms. Orrison contacted Vital WorkLife and Mayo's Employee Assistance Program but neither could provide or help her locate drug dependency treatment options for her son. Otherwise, Ms. Orrison had already exhaustively searched for options through Medica's search tool and found nothing. HR closed Ms. Orrison's case without follow up or resolution.

102.    By the end of 2021, Ms. Orrison questions remained unanswered. As a result, she was unable to knowledgeably select an appropriate health care plan during the 2022 open enrollment period.

103.    On December 5, 2022, Ms. Orrison contacted a Mayo HR employee about whether Mayo could help her with pending questions about her open Medica claims for which Medica would give her no answers. [4] She explained to the employee that she called Medica customer service regularly, but the last three times she called, Medica told her a representative would call her back but did not do so.

---

[3] HR Connect Case Online number HRC0853280.
[4] HR Connect Case Online number HRC2071395.

104.    Neither Medica nor Mayo would provide necessary information to Ms. Orrison to allow her to make an informed decision about the health plan she should select during open enrollment season. Because Medica's search tool yielded no in-network providers for pediatric mental healthcare or mental healthcare for patients under eighteen years of age and Mayo refused to fill in the gap, Ms. Orrison was unable to knowledgeably select an appropriate health care plan during the 2023 open enrollment period.

105.    Ms. Orrison reported to the Mayo HR that she was carrying thousands of dollars in out-of-pocket expenses that needed to be resolved. After this HR case, Ms. Orrison was assigned to the Medica Member Advocate named Stephanie Hughes, whose brief interactions with Ms. Orrison are recounted above.

106.    On April 17, 2023, Ms. Orrison opened another Mayo HR case after receiving an April 17, 2023, letter denying the appeal she submitted to Medica after it rejected her request to reimburse her earlier medical expenses.[5] On this particular matter, Mayo never responded to Ms. Orrison, and Mayo HR closed the case without any action at all.

107.    On April 29, 2023, Ms. Orrison contacted HR seeking information about the status and reimbursement of her claims.[6] At this time, she again noted that (1) she could not submit a provider NPI number because the provider did not have one, and (2) that it was only within the prior month that the search tool revealed the existence of in-network providers of pediatric mental health services. Again, HR minimized Plaintiff's concerns, changing her case priority from High to Low, and closing the case by noting that Medica requires a provider NPI to process claims and that they can process the claims upon receipt of a provider NPI. But Ms.

---

[5] HR Connect Online Case numbers HRC2375455 and HRC2375547.
[6] HR Connect Online Case number HRC2375548.

Orrison again obtained no information from Mayo about why her claims were being denied or how to submit her out-of-network claims for a provider who does not have a provider NPI number so she could be reimbursed.

108.    On June 5, 2023, Ms. Orrison again communicated with Mayo HR about it closing the case without doing any investigation or obtaining any resolution to the matter.[7] She again noted that Medica was responsible for "providing documentation that clearly states the reason for my denial" and giving an "MHPAEA Analysis disclosure." Ms. Orrison noted that she had repeatedly requested these items from Medica, but it had not responded to her concerns, much less offered any kind of solution. Again, however, she received no helpful information from Mayo HR, which closed the case without resolving her concerns by sending an automated e-mail.

109.    Two days later, Ms. Orrison again contacted Mayo HR, explaining the difficulties she was having with Medica's external appeal process and asking for further assistance.[8] At that time, Ms. Orrison noted that in submitting materials to the Medical Review Institute of America, the organization considering the appeal of Medica's denial of coverage, Medica had omitted material information about the denial, including information Ms. Orrison had submitted, such as the lack of search results when she attempted to identify in-network pediatric mental health providers or mental health care for patients under 18 years of age. The information Ms. Orrison submitted should have been stored on Medica's Guiding Care system which is used to document and store critical member documentation in the event of a future external review case. Again, Mayo closed the case without the courtesy of a response.

---

[7] HR Connect Online Case number HRC2442196.
[8] HR Connect Online Case number HRC2450585.

29

110.    That same day, Ms. Orrison again contacted Mayo HR to further discuss the belated revelation from the Medica search tool that in-network pediatric mental health providers were available.[9] Despite the thousands of dollars Ms. Orrison had spent resulting from Mayo and Medica's conduct, all Mayo could say was "Thank you for your recent email to HR Connect. Your concerns have been noted. You should hear directly from the information you submitted on your formal external appeal."

111.    Ms. Orrison again contacted Mayo HR on June 16, 2023,  addressing the short response received from her June 7, 2023, HR case.[10] Ms. Orrison expressed distress and frustration at having no solutions and feeling ignored:

> The reality is that I have asked and reached out to anyone that I could repeatedly asking for help but have been ignored and faced one obstacle after another. I am at a loss to understand why I am being treated this way. If Mayo HR is not willing to respond to my many attempts to ask for support in resolving the significant issues with Medica I have reported, please tell me who I need to contact.

The only response Ms. Orrison received was a notice that the case was closed and the statement: "Now that you have submitted your concerns to an Independent Review Organization, HR Benefits can no longer review/discuss your case."

112.    On June 22, 2023, Ms. Orrison again contacted HR to ask where she could find the policy or official documentation regarding company policy on HR support in the context of a medical appeal.[11] HR closed the case, stating:

> [T]he charges that you have paid out of pocket should be submitted to Medica as you are entitled to reimbursement for eligible medically services . . . . I can email it to Medica, rather than you sending it through the mail. I will request Medica to expedite the processing of your claims that you have been holding.

---

[9] HR Connect Online Case number HRC2450618.
[10] HR Connect Online Case number HRC2469683.
[11] HR Connect Online Case number HRC2480419.

But the offer to submit claims and request expedited processing did not address Ms. Orrison's questions or concerns regarding reimbursement calculations, deductibles, or related questions.

113. In November 2023, Ms. Orrison contacted HR to ask about Mayo's 2024 open enrollment process.[12] The specific questions asked were:

> 1. Will Out of Network Mental Health Provider services/visits be covered at the Tier 2 Level for 2024, similar to 2023? 2. In the past, when seeing an out of network, mental health provider I noticed that the amount I paid to the provider did not consistently get counted towards the deductible amount or to the out-of-pocket maximums listed for my specific Plan. What is the formula used to determine what percentage or amount will be applied to the plan's deductible or out of pocket maximum so that I can calculate the actual costs between the different plans. Without knowing how the applied amount will be determined, it is very difficult to decide between the different plans based on my anticipation of actual costs."

Ms. Orrison specifically asked about calculations and how mental health care provider services are reimbursed and counted towards her deductible.

114. On November 13, 2023, Ms. Orrison received a response "When you see an Out-of-Network Mental Health practitioner, Mayo elevates your member benefits to apply Tier 2 In-Network benefits and the charges the Mayo Medical Plan covers are based on the "Allowed Amount." Allowed amounts are negotiated on a claim-by-claim basis, and, if no agreement can be made, the allowed amount is calculated using an industry-wide formula referred to as Usual and Customary. This is the amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar service. This calculation takes into account multiple factors and can fluctuate throughout the year for the same provider and service. This is likely the reason you have seen different amounts applied to your deductible and coinsurance in the past. All allowed amounts after the elevation to Tier 2 will apply to your deductible and out-of-pocket maximum." Ms. Orrison was still unable to determine how and

---

[12] HR Connect Online Case number HRC2730789.

why her claims were being denied or not covered and how and why certain amounts were not applied to her deductible. HR's explanation did not assist Ms. Orrison in determining out- -of-pocket expenses or what health care plan was best to select.

115.   Ms. Orrison was persistent and continued to reach out to Mayo HR in an attempt to get answers to her pressing and immediate health care concerns. These attempts were either ignored or met with great resistance.

116.   Ms. Orrison used every tool at her disposal to attempt to locate an in-network mental health care provider for her child. She did not have the luxury of time. She could not wait on Medica, Medica's customer service, Medica's Member Advocate, Mayo's HR, her supervisor, or Mayo's IT before securing mental health care for her son. She had to act and did so in the best interest of her child. She then followed up insistently after her child's treatments to resolve the roadblocks and issues.

**D.   Complaint to Mayo's Compliance Department**

117.   On June 30, 2023, Ms. Orrison completed the mandatory annual Integrity and Compliance Training online through Mayo. The training materials repeatedly noted that employees have an obligation to report any concerns they may have regarding violations of regulatory process and procedures. The training stressed that there was an anti-retaliation policy and instructed employees to ask to speak with the Chief Compliance Officer when calling or to report concerns online. In July 2023, Ms. Orrison reported her concerns to the Integrity and Compliance Office and was assigned to work with Janelle Potter, Compliance/Privacy Officer at Mayo for Case CE-3196.

118.   On July 19 and 20, 2023, Ms. Orrison and Janelle Potter met via a zoom call to discuss Ms. Orrison's concerns. Ms. Orrison brought up many concerns including the following:

(1)   The change to the Medica Member Portal search tool, which took place sometime between March 24, 2023, and March 30, 2023, suddenly showed in-network providers for the same search Ms. Orrison had been conducting for years, but that change was not communicated to health Plan members.

(2)   Because the Medica Member Portal search tool had displayed incorrect results for years, Ms. Orrison asked if someone could look into the percent of claims submitted for mental health for patients under eighteen years of age because those individuals likely were having the same issue with finding in-network providers like Ms. Orrison. She was told that anyone in Arizona would be able to find mental health care because mental health is the 3rd highest type of claim.

(3)   Ms. Orrison also asked who is responsible for ensuring provider options are displayed accurately in the Medica Member Portal search tool.

(4)   Ms. Orrison identified multiple issues with Mayo's HR Connect system including:

i.   Mayo did not respond and closed HR cases without any resolution.

ii.   Ms. Orrison was told HR and other Mayo leadership could not communicate with Ms. Orrison because her external review appeal was pending.

iii.   Ms. Orrison was told that the External Appeal review company would respond to her questions and concerns even though Ms. Orrison explained that their role and responsibility was limited to a decision on payment for claims submitted.

iv. Ms. Orrison's multiple requests to HR Connect and Medica to escalate issues went unanswered and unresolved.

v. Ms. Orrison never received a response to her request to see if Medica would preapprove requested services and also never received a response to her question about exceptions for individual therapy providers.

vi. Ms. Orrison never received an explanation about the NPI issue as identified in the sections above.

vii. Ms. Orrison asked about ERISA and MHPAEA and was told she simply had a "technical difficulty."

viii. Ms. Orrison expressed concerns to Mayo HR that she couldn't get answers from Medica, so she reached out directly to Blue Cross Blue Shield ("BCBS"). BCBS told her that Medica is responsible for administering the health Plan, so they are the party that needs to answer her questions. HR Connect did not acknowledge this concern.

ix. Ms. Orrison explained the issues she had with her assigned Medica Member Advocate and the lack of resolution or answers to any of her questions.

(5) An excel spreadsheet was deleted from Ms. Orrison's H drive on her Mayo computer that she used to track Medica claims submitted for mental health services paid out of pocket. No one notified her of the file's removal or offered any explanation. She only recovered the file upon looking in a hidden folder.

34

(6)   Ms. Orrison was unable to make an informed decision when choosing a health Plan for 2022 or 2023 during Open Enrollment because Medica wasn't processing her submitted claims within the required time frame or offering actual explanations as to how reimbursements were calculated.

119.   Immediately after meeting with Ms. Potter, Ms. Orrison sent multiple examples and follow-up emails to provide documentation backing up her concerns.

120.   On August 14, 2023, Ms. Potter emailed Ms. Orrison and stated "Thank you for contacting Compliance and taking the time to express your concerns regarding Medica and the Mayo Medical Plan. . . . Due to privacy-related constraints to Mayo Medical Plan information imposed under HIPAA, Compliance is not able to review and investigate certain aspects of your concerns. . . . Compliance has completed intake of your concerns and, for the above reasons, has closed CE-3196."

121.   On October 4, 2023, Ms. Orrison received a final response to her Compliance Case:

CE-3196 is closed. If you have new concerns of misconduct or policy violations, please contact your leadership team or the Compliance Office.

Your concerns were taken seriously. Though you might have hoped for a different outcome, the investigation is complete. Therefore, it would be most useful to focus on the future and       next steps.

Janelle H. Potter
Compliance/Privacy Officer

122.   Once again, Ms. Orrison's attempt at finding answers was unsuccessful. Ms. Orrison exhausted every possible avenue she could think of in an attempt to understand her health Plan, insurance reimbursement, and the system, but was never able to get any answers.

**E.      Explanation of Benefits Confusion**

123.    Following therapy and evaluation treatments for her son, Plaintiff submitted claims for these services to Medica for coverage as required under the Plan.

124.    Medica consistently failed to make ABDs within the timeframe required by the Plan and ERISA. In one instance, Medica failed to respond to a claim for over three months. As a result of this delay, Plaintiff was required to select her health Plan for both 2022 and 2023 without knowing how services would be reimbursed under the various plans. Only after Plaintiff had selected her Plan for the year 2022 did she learn that Medica would only reimburse certain services up to the NNPRA rate, leaving her responsible for the remaining balance. Had Medica provided ABDs within the time period required by the Plan and ERISA, Plaintiff would have selected an alternative Plan to account for the out-of-network mental health care coverage.

125.    Other examples of delayed EOB's include, but are not limited to:

| CLAIM NUMBER | DATE SUBMITTED | DATE OF EOB |
|---|---|---|
| Claim #: 1000010734974 | 6/21/2022 | 9/1/2022 |
| Claim #: 1000011764947 | 9/7/2022 | 12/8/2022 |
| Claim #: 1000014223749 | 6/29/2023 | 8/03/2023 |
| Claim #: 1000012597677 | 12/01/2022 | 02/24/2023 |
| Claim #: 1000012451860 | 01/04/2023 | 02/16/2023 |
| Claim #: 1000012821044 | 01/26/2023 | 03/17/2023 |
| Claim #: 1000014532644 | 7/19/2023 | 08/31/2023 |
| Claim #: 1000013785641 | 05/15/2023 | 06/22/2023 |
| Claim #: 1000014223749 | 06/29/2023 | 08/03/2023 |
| Claim #: 1000014532644 | 07/19/2023 | 08/31/2023 |
| Claim #: 1000015666582 | 10/16/2023 | 12/14/2023 |

36

| Claim #: 1000016157841 | 12/08/2023 (medica then lost claim and re-submitted on 1/19/2024) | 01/26/2024 |
|---|---|---|
| Claim #: 1000016631734 | 01/22/2024 | 03/07/2024 |
| Claim #: Pending[13] | 5/23/2024 | TBD |

126. These ABDs, which, as stated above, came in the form of EOBs, failed to provide notice to Plaintiff of the specific provision justifying the determination. Specifically, the EOBs failed to identify the specific provision of the NNPRA Pricing Method applied to determine the NNPRA. The EOBs also did not inform Plaintiff that in-network providers were available within her geographic area.

127. Rather than provide reference to the specific provision justifying the ABD, the EOBs used "Notes ID" providing vague justifications using terminology inconsistent with the Plan documents. For example, the term NNPRA is not used in any EOB. The image below is an example of a "Notes ID," however, each EOB contains a variety of codes, therefore they vary and are usually not exactly the same.

---

[13] A claim number is generated upon the issuance of an EOB. Ms. Orrison submitted this claim on May 23, 2024, and has yet to receive an EOB.

128.    Because of the lack of specific information provided by Medica, Plaintiff lacked the requisite information to understand the bases for the ABDs or the means of calculation. As a result, Plaintiff was deprived of the information necessary in order to perfect her claim and receive the "full and fair" review of her claim guaranteed under ERISA.

129.    Plaintiff appealed the ABDs concerning the out-of-network mental healthcare within the timeframe required by her Plan and ERISA. She provided all information available to her; however, she was denied access to material and necessary information including the NNPRA Pricing Method used, how the NNPRA Pricing Method was calculated, and why the specific NNPRA Pricing Method was utilized. This denied Plaintiff the ability to obtain a "full and fair review" of her claim as required by ERISA.

130.    In response to Plaintiff's appeal, Medica upheld its EOBs. While the appeal letters identified general provisions of the Benefits Booklet, it failed to identify the specific provision used to calculate the NNPRA. The letters failed to identify which NNPRA Pricing Method was used, how the NNPRA amount was calculated, or why the particular method was used.

131.    The appeal letters also claimed that Medica identified in-network mental healthcare providers within Plaintiff's geographic area. One such letter stated: "A review of the Mayo Arizona provider network found several mental health providers within 25 miles of your zip code. If you are [un]able to find a network provider on the Medica.com/Signin, find care,

38

please contact Medica Member Services for the Mayo Medical Plan at the number listed on your ID card."

I've reviewed your appeal and am unable to grant your request for the following reasons:
- A review of the Mayo Arizona provider network found several mental health providers within 25 miles of your zip code. If you are able to find a network provider on Medica.com/Signin, find care, please contact Medica Member Services for the Mayo Medical Plan at the number listed on your ID card.
- Your employer plan covers out-of-network mental and behavioral health claims at the Tier 2 in-network benefits level. However, when a provider is out-of-network, they may bill you the amounts above the non-network provider reimbursement amount (NNPRA).

132.    The appeal letter failed to state how Medica was identifying in-network versus out-of-network pediatric mental healthcare providers. It also failed to reveal whether Medica looked into its own Medica Member Portal search tool through the online portal provided to Medica members to determine the accuracy of what is being communicated to its members.

133.    Interestingly, after Plaintiff communicated her concerns repeatedly from 2019 to 2023 regarding the Medica Member Portal search tool, Medica updated the portal at some point between March 24 and March 31, 2023, without comment. After this coincidental update, the portal suddenly showed in-network pediatric mental health care providers, which Medica pointed out to Plaintiff, stating that she should have utilized those providers that were then identified through the portal.

134.    Plaintiff continued to communicate with both Medica and Mayo, specifically asking Defendants to identify which NNPRA Pricing Method was used. Medica and Mayo never provided Plaintiff with the requested information.

135.    Plaintiff continued to appeal her claims, eventually seeking an external appeal. The external appeal body, Medical Review Institute of America, LLC ("MRIA"), upheld

39

Medica's determinations. Like Medica, MRIA did not identify which NNPRA Pricing Method was used, how the NNPRA was calculated, or why that particular method was used.

136.   MRIA also found that "[t]he Mayo Arizona provider network has multiple mental health providers within 25 miles of the patient's zip code. The patient indicated that she was unable to find a provider online but there is no record that the Plan was contacted to inquire about in-network providers or to request prior authorization for use on an out of network provider prior to receiving the services."

137.   MRIA does not identify what evidence supported its claim that Mayo Arizona had pediatric mental health care services in Plaintiff's geographic area. MRIA also did not reference any provision of the Benefit Booklet that required Plaintiff to directly contact Medica to inquire about in-network providers or seek prior authorization before using an out-of-network provider. MRIA also does not explain how they had no record of Ms. Orrison's many attempts at contacting the Plan for information.

138.   Medica's Benefit Booklet contains a provision for clerical errors and misstatements. "You will not be deprived of coverage under the plan because of a clerical error or misstatement by the plan or plan administrator." (Benefits Booklet, p. 138.) The issue that Ms. Orrison identified with the Medica search tool is clearly an error and misstatement. When Medica finally listened to Ms. Orrison's concerns, the portal was updated and finally produced in network providers. Prior to the portal update, Ms. Orrison conducted the search through the Medica search portal at least 50 times and it produced zero in network providers. And with persistence, Ms. Orrison followed up on the search calling Medica's customer service, working with a Medica Member Advocate, contacting Mayo's HR, and appealing EOBs. Yet, when Ms.

40

Orrison submitted her claims, she was denied full reimbursement or granted only partial reimbursement.

139. From the time Plaintiff submitted her claims through the appeals, Medica and Mayo denied Plaintiff the specific provisions justifying their ABDs. Specifically, Medica and Mayo failed to disclose the specific provisions relied on and the NNPRA Pricing Method used to calculate the NNPRA. As a result, Plaintiff was deprived of the necessary information to perfect her claim and push for a "full and fair review."

140. As a result of Defendants' conduct, Defendants routinely underpaid Plaintiff's claims and then deprived Plaintiff of the means to effectively challenge said underpayments.

141. Plaintiff has made numerous efforts to appeal Defendants' underpayments, exhausting all administrative remedies available.

142. Defendants routinely failed to disclose material information concerning which NNPRA Pricing Method was applied, why that particular method was applied, and how the NNPRA Pricing Method was calculated. Defendants also failed to apply NNPRA Pricing Methods consistently, resulting in arbitrary, inconsistent, and unpredictable reimbursement amounts.

143. Plaintiff would not have sought certain out-of-network mental and/or behavioral health treatments had Defendants maintained an accurate database of in-network providers. Likewise, had Defendants provided timely information regarding the rate at which they would reimburse certain claims for out-of-network mental and/or behavioral health treatment, then Plaintiff would have had the opportunity to make an informed financial decision regarding her health plan in future years.

41

**F.      Inaccurate Satisfied Amounts and Cost Summaries**

144.    In November 2023, under belief that neither she, any individual family member, nor her family as a whole had met the deductible under the Mayo Select Plan in either of the previous two years, Ms. Orrison enrolled in the Mayo Custom Plan, a high deductible Plan.

145.    On January 19, 2024, after several unsuccessful attempts to reach Ms. Hughes, the Medica Member Advocate, Ms. Orrison remained on Medica's customer service line to wait for the next available Medica Member Advocate.

146.    Ms. Orrison was then connected to Medica Member Advocate "Basheerah." Ms. Orrison asked, "How can I see the amount applied to my Out-of-Pocket Maximum for each individual visit on either the EOB or the Medica Member Portal?" Basheerah explained that she was using a system called Health Rules to look at Ms. Orrison's individual claim details and benefits.

147.    Ms. Orrison went through specific EOB's and the information listed in her Medica Member Portal under "Claims" and "Cost Summary." Basheerah then identified that the satisfied amounts for both deductibles and out of pocket maximums were different in the Health Rules System from what Ms. Orrison saw on her Medica Member Portal. Basheerah indicated that she did not have access to the Member Portal, so she was unable to explain why the amounts were inconsistent between the systems.

148.    According to the Health Rules system, Ms. Orrison had met her Family deductible or Satisfied Amounts for 2022. On the Medica Member Portal it showed that Ms. Orrison had not met her Family deductible or Satisfied Amounts for 2022.

149.    On January 22, 2024, Ms. Orrison requested 2022 and 2023 "Satisfied Amount Totals" for individual and family totals to compare to the information she had on her Medica

42

Member Portal in an attempt to figure out her deductible. On January 28, 2024, Ms. Orrison filed an official complaint regarding the inconsistent Satisfied Amounts.

150. On February 22, 2024, Medica sent Ms. Orrison the requested "Satisfied Amount Totals." The information from the Health Rules system did not match Ms. Orrison's EOB's or Medica's online member portal.

151. On March 5, 2024, Medica denied Ms. Orrison's complaint.

> Hello Sherry,
>
> Thank you for contacting Medica regarding your individual and family deductibles and out-of-pocket maximums for yourself and your family members. In your complaint, you stated that you noticed that the amounts on your EOB statements were different than what you showed on your online accounts. You also learned that they didn't always match what was in Medica's system.
>
> After researching your issue, I found that, on February 9, 2024, Medica received Releases of Information for all family members. On February 22, 2024, representative Jasmine sent you the individual deductible totals for both individuals and family or all Tiers in 2022 and 2023. I have confirmed that the information provided is correct (see attached email communications).
>
> I apologize for any inconvenience this may have caused.

152. Ms. Orrison never received an explanation for the inconsistencies between the Health Rules system that Medica customer service uses and the Medica Portal/EOBs.

153. Shortly after this, Ms. Orrison received a voice message from her assigned Medica Member Advocate, Ms. Hughes, who stated that if Ms. Orrison contacted Medica Customer Service again rather than speaking directly to her and only her, Ms. Orrison would be removed from the Medica Advocate List.

## VI. CLASS ACTION ALLEGATIONS

154. Plaintiff brings this action on behalf of herself, and all other persons similarly situated (hereinafter referred to as "the Class").

43

155.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

Any subscriber or beneficiary of a Mayo self-funded group health care plan from January 1, 2019, to the present ("Class Period").

156.    Excluded from the Class are all Defendants, any entities in which a Defendant has a controlling interest, any Judge to whom this action is assigned and any members of such Judge's staff and immediate family.

157.    Plaintiffs do not know the exact number of members in the Class but reasonably believe that Class members number in the thousands and is therefore so large as to make joinder of all members impracticable within the meaning of Rule 23(a)(1) of the Federal Rules of Civil Procedure.

158.    Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, there are questions of law or fact common to all class members, including, but not limited to, the following:

(1)    whether Defendants have underpaid the Class for out-of-network health services based upon improper methodologies for pricing NNPRA rates;

(2)    whether Defendants have breached their fiduciary duties to the Class;

(3)    whether Defendants use of its NNPRA Pricing Methods to reimburse the Class violates ERISA;

(4)    whether the Medica Member Portal search tool provided materially false information concerning the availability of health service providers;

(5)    whether Class members relied on the materially false information conveyed by Defendants on the Medica Member Portal search tool to select out-of-

network health service providers given the apparent lack of in-network providers identified by the Medica Member Portal search tool;

(6)     whether Class members relied on the materially false information conveyed by Defendants on the Medica Member Portal search tool where the member would go to a supposedly in-network provider, only to find the search tool hadn't been updated and the provider was actually out-of-network;

(7)     whether Class members out-of-network health services were underpaid or unpaid as a result of the materially false information contained on the Medica Member Portal search tool;

(8)     whether Class members may recover unpaid and/or underpaid benefits and how these unpaid and underpaid benefits may be calculated;

(9)     whether Defendants failure to provide Class members with adequate notice of the NNPRA Pricing Methods used to calculate the reimbursement rates for out-of-network services violates ERISA;

(10)    whether Defendants claims review procedures comply with ERISA;

(11)    the standard of review applicable to Defendants' ABDs (EOBs);

(12)    the standard of review applicable to Defendants' appeal decisions;

(13)    whether the contractual terms of the relevant Plans authorize Defendants' NNPRA Pricing methods;

(14)    whether Defendants violated their fiduciary duties owed to Class members when it made reimbursement decisions based on its NNPRA Pricing Methods or otherwise engaged in the conduct alleged in the Complaint;

45

(15)   whether Defendants' failure to properly disclose the specific reasons or NNPRA Pricing Methods in its ABDs (EOBs), and failure to disclose other material information, violated ERISA;

(16)   whether Class members are entitled to declaratory and/or injunctive relief arising from Defendants conduct as alleged herein;

(17)   whether interest should be added to the payment of unpaid and/or underpaid benefits under ERISA; and

(18)   the appropriate damages to be awarded for Defendants' conduct that violated legal and/or fiduciary standards.

159.   The claims of Plaintiff are typical of the claims of the defined Class, within the meaning of Rule 23(a)(3) of the Federal Rules of Civil Procedure and are based on and arise out of the same uniform and standard illegal practices of the Defendants, as she alleges herein. The proposed class representative states claims for which relief can be granted that are typical of the claims of absent class members. If litigated individually, the claims of each class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

160.   Plaintiff is committed to pursuing this action and serving the proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately represent the interests of the members of the proposed Class within the meaning of Rule 23(a)(4) of the Federal Rules of Civil Procedure, and will not have any interests adverse to, or that directly or irrevocably conflict with, the interests of other class members.

161.   Plaintiff has retained counsel experienced in handling class action claims.

46

162.    A class action is the superior method for the fair and efficient adjudication of this controversy. Class wide relief is essential to ensure that all individuals subjected to Defendants' uniform and standard illegal practices are equally compensated. Separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Mayo and Medica as to the Class. The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small. Further, because some of the unpaid benefits denied Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members to individually redress the harm done to them. Given the uniform policy and practices at issue, there will also be no difficulty in the management of this litigation as a class action.

163.    Defendants acted on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief with respect to the Class appropriate.

## VII.    CAUSES OF ACTION
### COUNT I
### Violations of RICO: 18 U.S.C. § 1962(c)
### (On behalf of Plaintiff and the Class Against Mayo and Medica)

164.    Plaintiffs and the Class hereby repeat and reassert the General and Class allegations as if fully set forth herein.

165.    The object of the civil Racketeer Influenced and Corrupt Organizations Act (RICO) is not merely to compensate victims but to turn them into prosecutors, that is, private attorneys general, dedicated to eliminating racketeering activity. 18 U.S.C.A. § 1961 *et seq*.

166.    Plaintiff and the Class' RICO claim is not precluded by the McCarran–Ferguson Act, § 2(b), 15 U.S.C. § 1012(b), as "RICO is not a law that 'specifically relates to the business of insurance'" and where, as here, the claims at issue do not "invalidate, impair, or supersede" any relevant state laws regulating insurance. *Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999). Defendants can comply with both RICO and relevant state laws governing insurance and Plaintiff and the Class' RICO claim is not precluded.

167.    Mayo and Medica acted as an "enterprise" under 18 U.S.C. § 1961(4), have engaged in acts of racketeering activity, namely, violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and "Federal Health offenses" per 18 U.S.C. § 24 that include violations of 18 U.S.C. §§ 1027, 1341, and 1343.

168.    Mayo and Medica provide a "health care benefit program" to its members, which includes Plaintiffs and the Class.[14]

169.    A "Federal health offense" is defined as "a violation, or a criminal conspiracy to violate . . . [18 U.S.C. §] 1027. . . or section 411, 518, or 511 of the Employee Retirement Income Security Act of 1974," 18 U.S.C. § 24.

170.    Mayo and Medica's actions, as alleged supra, are criminal acts under 18 U.S.C. § 1027 that states, "[w]hoever, in any document required by title I of the Employee Retirement Income Security Act of 1974 (as amended from time to time) to be published . . . of any employee welfare benefit plan . . . makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which

---

[14] A "health care benefit program" is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b).

is required by such title . . . shall be fined under this title, or imprisoned not more than five years, or both."

171.    Medica, under ERISA, is required to "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133. Under ERISA, a notification of any adverse benefit determination must communicate, "in a manner calculated to be understood by the claimant . . . [t]he specific reason or reasons for the adverse determination." 29 C.F.R. § 2560.503–1(g)(1)(i). The notification must also make "[r]eference to the specific plan provisions on which the determination is based," 29 C.F.R. § 2560.503–1(g)(1)(ii), and it must describe "the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review." 29 C.F.R. § 2560.503–1(g)(1)(iv).

172.    The Plaintiffs and the Class received EOBs from Medica that did not meet these requirements.

(1) The EOBs failed to identify the specific provision of the Benefit Booklet justifying the NNPRA.

(2) The EOBs failed to identify the NNPRA Pricing Method used.

(3) The EOBs failed to specify how the NNPRA was calculated.

(4) The EOBs failed to state why the particular NNPRA Pricing Method was utilized.

173.    The EOB made no mention of the NNPRA, instead using terms such as "Allowed Amount," "Patient Non-Covered Amount," and "Deductible Amount" that were not mentioned or defined in either the Summary Plan Description or Benefits Booklet provided to members.

174. The EOB also failed to identify which method it used to calculate the NNPRA. As a result, the "Allowed Amounts" varied across different services, with little information explaining or justifying these differences. As a result, Plaintiff and Class members were held financially responsible for arbitrary, inconsistent, and unpredictable reimbursement amounts.

175. Mayo and Medica also operate the Medica Member Portal search tool on Medica's website and direct members to use the Medica Member Portal search tool to locate in-network providers. As a result of Medica and Mayo's design and operation of the Medica Member Portal search tool, the Medica Member Portal search tool falsely informs members that in-network providers are not available within their geographic network and/or falsely inform of supposed in-network providers, when in reality the providers are out-of-network, meaning the search tool hasn't been updated with current information.

176. In reliance upon these false Medica Member Portal search tool results, Plaintiff and the Class seek out-of-network providers who, according to the terms of the Plan, will be covered at in-network rates because no in-network providers are available.

177. After Plaintiff and Class members act in reasonable reliance on the Search Term results, however, Medica and Mayo enter EOBs holding Plaintiff and the Plaintiff Class responsible for the services at out-of-network rates, charging the difference between the providers' charge and inconsistent and arbitrary NNPRA rates.

178. To justify the EOBs, Medica and Mayo claim that in-network providers are available, despite the Medica Member Portal search tool identifying no such providers. Medica and Mayo make this justification based on internal information unavailable to members.

179. Mayo and Medica's actions, as alleged supra, are criminal acts under 18 U.S.C. § 1035 that makes it a crime "in any matter involving a health care benefit program" to

50

"knowingly and willfully" make "any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services."

180.    Mayo and Medica's actions, as alleged supra, are criminal acts under 18 U.S.C. § 1343 that makes it a crime for: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

181.    At all relevant times, Mayo and Medica knew that the claims at issue here would be underpaid at the lowest possible rate.

182.    Mayo and Medica thus obtained the value of the Plaintiff and the Plaintiff Class' overpayments for Mayo and Medica's underpayment of services and retained those benefits illegally.

183.    Medica makes false representation by wire and US mail to the Plaintiff and the Class through mailing and issuing EOBs containing false and incorrect information.

184.    Plaintiff has RICO standing to bring these claims.

185.    The harm suffered by Plaintiff is her payment of excessive balance bills. Plaintiff paid large sums of money that were properly Medica's responsibility.

186.    This harm is "by reason of" the RICO violation. Without the RICO activity engaged in by Mayo and Medica, these harms would not have arisen.

187.    It is the enterprise between Mayo and Medica and the RICO violations described above that caused Plaintiff's harm.

188.    Mayo and Medica are "persons" within the meaning of RICO under 18 U.S.C. §§ 1961(3) and 1964(c).

189.    Mayo and Medica carried out their underpayment scheme through their joint participation and conduct in an association-in-fact "Enterprise," within the meaning of 18 U.S.C. § 1961(4). The Enterprise is comprised of Mayo and Medica.

190.    Medica through the Enterprise described above and in conspiracy with Mayo undertook a fraudulent scheme to underpay for health services.

191.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of RICO, 18 U.S.C. § 1962(c).

192.    The Mayo-Medica Enterprise was at all relevant times a continuing unit involving Mayo and Medica functioning with a common purpose of underpaying for health services and increasing the profits of the Enterprise.

193.    Mayo and Medica remained members of the Enterprise undertaking countless and nearly constant acts of mail and wire fraud for their common purpose described above. This includes, but is not limited to, mailing benefits information, EOBs and reimbursement decisions, and conveying false information electronically through the Medica Member Portal.

194.    Their fraudulent and deceptive acts further constitute criminal activity as described supra.

195.    The Enterprise was used to create a mechanism or vehicle by which Medica could reduce payments through the use of a deceptive, flawed process that could not be challenged effectively, including by appeal.

52

196.   The above-described pattern of racketeering activity is related because it involves the same fraudulent scheme, common persons, common out-of-network claim practices, common results impacting upon common victims, and is continuous because it's been occurring since 2019, and constitutes the usual practice of Medica and the Enterprise, such that it amounts to and poses a threat of continued racketeering activity.

197.   Mayo's and Medica's scheme to defraud is open-ended and on-going.

198.   The direct and intended victims of the pattern of racketeering activity described previously herein are the Plaintiff and Class, whom Medica has forced to overpay for health services.

199.   As a result of Medica's fraudulent scheme, Plaintiff and the Plaintiff Class were injured in their business or property by reason of Medica's RICO violations because they were forced to overpay for health services.

200.   Mayo and Medica have further deprived Plaintiff and the Plaintiff Class of the knowledge necessary to discover or challenge the underpayments.

201.   Plaintiff and the Class' injuries were proximately caused by Mayo's and Medica's violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended and natural consequence of the aforementioned RICO violations (and commission of underlying predicate acts) and, but for the RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

202.   Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiff and the Class are entitled to recover threefold their damages, costs and attorneys' fees from Mayo and Medica and other appropriate relief

53

## COUNT II

## Claim for Underpaid Benefits Under Group Plans Governed by ERISA
## (On Behalf of Plaintiff and the Class Against Mayo and Medica)

203.   The General and Class Allegations are hereby repeated as if fully set forth herein.

204.   Mayo and Medica violated their legal obligations under ERISA-governed Plans and federal common law each time it made the benefit reductions that resulted in the underpayment of the claims at issue.

205.   These underpayments are adverse benefit determinations and are violations of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

206.   Medica's breaches included, among other things, the misuse of NNPRA Pricing Methods to underpay and reduce benefits paid to providers for out-of-network health services.

207.   In certain employer-funded Plans, Medica makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to the payment of benefits.

208.   Where Medica acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Medica is liable for underpaid benefits to Plaintiff and members of the Plaintiff Class. Where Mayo fully funds the health Plan and adopts benefit determinations by Medica, Mayo is also liable for underpaid benefits to Plaintiff and members of the Plaintiff class.

209.   Mayo and Medica further violated its obligations under ERISA when it failed to comply with applicable state laws that require Mayo and Medica to pay provider charges using the appropriate methodologies.

210.    Mayo and Medica's omissions and lack of disclosure to the Plaintiff and the Class, its members, violated its legal obligations.

211.    Mayo and Medica violated obligations each time it engaged in conduct that discouraged or penalized its members' use of out-of-network providers, such as by making illegal benefit reductions and adverse benefit determinations.

212.    Mayo and Medica, as the party which exercised all discretionary authority and control over the administration of the Plan of each Plaintiff and the Plaintiff Class member including the management and disposition of benefits under the terms of the Plan, owed a fiduciary duty to Plaintiff and the Plaintiff Class.

213.    Mayo and Medica breached its fiduciary duties to Plaintiff and the Plaintiff Class by failing to pay proper out-of-network benefits without justification. Mayo and Medica therefore owe, and should be ordered to pay, the benefits that were illegally underpaid based on the policies detailed herein.

214.    Medica is liable to Plaintiff and the Plaintiff Class as they have overpaid in the amount that Medica was obligated to pay to providers.

215.    Plaintiff, on her own behalf and on behalf of the members of the Plaintiff Class, seeks underpaid benefits, recalculated deductibles, recalculated out-of-pocket maximum, recalculated coinsurance amounts, and interest dating back to the time the claims were originally submitted to Medica.

216.    Plaintiff requests attorneys' fees, costs, prejudgment interest and other appropriate relief against Mayo and Medica.

## COUNT III

## Failure to Provide Accurate EOB and SPD and Request for Declaratory and Injunctive Relief

### (On Behalf of Plaintiff and the Class Against Mayo and Medica)

217. The General and Class Allegations are hereby repeated as if fully set forth herein.

218. Mayo and Medica's disclosure obligations under ERISA include furnishing accurate materials summarizing its group health Plans, known as SPD materials, under 29 U.S.C. § 1022 and supplying accurate EOBs, SPDs and other required information is actionable under 29 U.S.C. § 1132(c).

219. Mayo and Medica's failure to disclose material information about their out-of-network benefit reductions, and illegal adverse benefit determinations, creating material changes to the Plaintiff and the Plaintiff Class' benefit policies without disclosure violated ERISA, federal regulations, and federal common law.

220. Plaintiff and the Plaintiff Class have been proximately harmed by Mayo and Medica's failure to comply with 29 U.S.C. §§ 1022 and 1024(b)(4), federal regulations, and federal common law, and are entitled to appropriate relief under ERISA, including injunctive and declaratory relief to remedy Mayo and Medica's continuing violation of these provisions.

## COUNT IV

## Violation of Fiduciary Duties of Loyalty and Due Care and Request for Declaratory and Injunctive Relief

### (On Behalf of Plaintiff and the Class Against Mayo and Medica)

221. The General and Class Allegations are hereby repeated as if fully set forth herein.

222. Mayo and Medica acted as "fiduciaries" to Plaintiff and the Plaintiff Class as such term is understood under 29 U.S.C. § 1002(21)(A).

56

223. As an ERISA fiduciary, Mayo and Medica owed, and owes, its Members in ERISA plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of a like enterprise.

224. Further, ERISA fiduciaries must act in accordance with the documents and instruments governing the group plan. 29 U.S.C. § 1104(a)(l)(B) and (D).

225. In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the Plan, Mayo and Medica violated its fiduciary duty of care.

226. As an ERISA fiduciary, Mayo and Medica owed and owes its Members a duty of loyalty, defined as an obligation to make decisions in the interest of its Members, and to avoid self-dealing or financial arrangements that benefit it at the expense of its Members under 29 U.S.C. § 1106. Mayo and Medica cannot, for example, make benefit determinations for the purpose of saving money at the expense of its Members.

227. Mayo and Medica violated their fiduciary duties of loyalty and due care by, inter alia, making out-of-network benefit reductions and adverse benefit determinations that were not authorized by the Plan documents and were also misrepresented on EOBs sent to the Plaintiff and the Class, causing Plaintiff and the Class to incur, and pay, substantial balance bills to the benefit to Mayo and Medica's bottom line.

228. In certain self-insured Plans, which are sometimes designated ASO, Mayo and Medica make the final decision on benefit appeals and/or have been given authority, responsibility, and discretion with regard to benefits.

229. Where Mayo and Medica act as fiduciaries or perform discretionary benefit determinations or otherwise exercise discretion or determine final benefit appeals, Mayo and Medica are liable for underpaid benefits to Plaintiff and the Class in both fully insured health

Plans, where benefits are paid from Mayo and Medica's assets, and in employer-funded ERISA health Plans.

230.    Mayo and Medica breached their fiduciary duties by sending noncompliant EOBs and other communications to Plaintiff and the Class. Member Deductible and Out of Pocket Maximum Satisfied Amounts are included on every EOB as well as on the Medica Member Portal under Cost Summary for Claims. Members utilize this critical information to make decisions on important care options and determine the best Health Plan for their family each year. Medica Member Advocates utilize a system called Health Rules to view member claim benefit details including the deductible and out of pocket maximum. It is critical that these satisfied amounts are accurate, but the information in Health Rules does not match the information included to Members either on the EOB or online. Medica's individual and family satisfied totals are not consistent with available EOB Statements or information online via the Medica Member Portal leaving members unaware of their actual satisfied amounts.

231.    In addition, Mayo and Medica violated (and continue to violate) their fiduciary duties of loyalty by failing to inform Plaintiff and the Class of material information, including but not limited to the lack of transparency concerning the NNPRA Pricing Methods and flaws in the data and methodology used to determine NNPRA reimbursement.

232.    In relying on improper pricing methods, which were noncompliant with its contractual obligations and invalid to make NNPRA determinations, and nowhere disclosed to Plaintiff and the Class in their Plan documents or EOBs, Mayo and Medica violated their fiduciary obligations to Plaintiff and the Class.

233.    Plaintiff and the Class are entitled to assert a claim for relief for Mayo and Medica's violation of their fiduciary duties under 29 U.S.C. § 1132(a)(3), including injunctive and declaratory relief, and seek their removal as breaching fiduciaries.

## COUNT V
## Violation of Fiduciary Duties of Full and Fair Review and Request for Declaratory and Injunctive Relief
### (On Behalf of the Class and Against Mayo and Medica)

234.    The General and Class Allegations are hereby repeated as if fully set forth herein.

235.    Mayo functioned and continues to function as the "Plan Administrator," and Medica functioned and continues to function as the "Claim Administrator" within the meaning of such term under ERISA, for Plaintiff and the Class.

236.    Plaintiff and the Class were entitled to receive a "full and fair review" of all Medica claims denied or partially approved (meaning they were effectively denied) and are entitled to assert a claim under 29 U.S.C. § 1132(a)(3) for failure to comply with these requirements.

237.    Although Medica was obligated to do so, it failed to provide a "full and fair review" of underpaid claims pursuant to 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Plaintiff and the Class by making out-of-network benefit reductions and adverse benefit determinations that are inconsistent with or unauthorized by the terms of the Plans, failing to disclose the NNPRA Pricing Method Medica used to arrive at these inappropriate reductions and adverse benefit determinations.

238.    ERISA and its implementing regulations set forth minimum standards for claim procedures, appeals, notice to members and the like. In engaging in the conduct described herein, Medica failed to comply with ERISA, its regulations and federal common law that require a "full

59

and fair review," failed to provide reasonable claims procedures, and failed to make necessary disclosures to its members.

239. Plaintiff and the Class were denied the opportunity to properly appeal Medica's adverse benefit determinations as Medica concealed from Plaintiff and the Class information necessary to afford Plaintiff and the Class a meaningful opportunity to challenge the determinations. The requirement to exhaust internal appeals under ERISA should, therefore, be deemed to be futile and/or waived for all Plaintiffs and the Class.

240. Plaintiff and the Class have been harmed by Medica's failure to provide a "full and fair review" of appeals under 29 U.S.C. § 1133, and by Medica's failure to disclose relevant information in violation of ERISA and the federal common law. Plaintiff and the Class are also entitled to a declaration by this Court that Medica's actions as alleged herein are in violation of its duties and obligations of ERISA and are entitled to injunctive and declaratory relief.

## COUNT VI
### Claim for Equitable Relief to Enjoin Acts and/or Practices
### (On Behalf of Plaintiff and the Class Against Mayo and Medica)

241. The General and Class Allegations are hereby repeated as if fully set forth herein.

242. Plaintiff brings this count on her own behalf, and on behalf of the putative class, pursuant to 29 U.S.C. § 1132(a)(3)(A) only to the extent that the Court finds that the injunctive relief sought to remedy Counts III through V are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

243. Plaintiff and the Class have been harmed, and are likely to be harmed in the future, by Mayo and Medica's breaches of fiduciary duties described in the Allegations and in Counts III through V above.

60

244.    Additionally, incorporated into Mayo and Medica's fiduciary duties, is the duty to act at all times in good faith and to deal fairly with Plaintiff and the Class.

245.    Mayo's duties include, but are not limited to, the duty to act fairly, reasonably, and promptly in dealing with their insureds, their agents, and/or representatives for adjusting claims, investing claims handling and properly paying all claims that Mayo is obligated to pay.

246.    Medica's duties include, but are not limited to, the duty to act fairly, reasonably, and promptly in dealing with their insureds, their agents, and/or representatives for adjusting claims, investigating claims handling and properly paying all claims that Medica is obligated to pay.

247.    In order to remedy these harms, Plaintiffs and the Class are entitled to enjoin these acts and practices pursuant to 29 U.S.C. § 1132(a)(3)(A).

## COUNT VII
**Claim for Violation of Mental Health Parity Act and Addiction Equity Act under 29 U.S.C. § 1132(a)(3)**
**(On Behalf of Plaintiff and the Class Against Mayo and Medica)**

248.    Plaintiffs and the Class hereby repeat and reassert the General and Class allegations as if fully set forth herein.

249.    Under the Mental Health Parity Act and Addiction Equity Act ("MHPAEA"), self-funded group health plans that cover mental health conditions and substance use disorders, like the self-funded Plans Mayo offered its employees, must provide those benefits at the same level as medical and surgical benefits.

250.    Under 29 C.F.R. § 2590.712(c)(2)(ii), "[i]f a plan (or health insurance coverage) provides mental health or substance use disorder benefits" in any of the following six classifications, then "mental health or substance use disorder benefits must be provided in" each

61

of the following six classifications in which medical/surgical benefits are provided": (1) inpatient, in-network; (2) inpatient, out-of-network; (3) outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription drugs.

251.   Plaintiff sought "inpatient, in network" and "outpatient, in-network" pediatric mental health services for her son under Mayo self-funded insurance Plans to treat substance use and underlying mental health issues.

252.   Given the greatly disparate number of inpatient, in-network, and outpatient, in-network, Tier 1 mental health and substance use treatment providers as compared to available Tier 1 medical/surgical treatment providers under the relevant Plans, upon information and belief Mayo and Medica violated MHPAEA with respect to both quantitative treatment limitations and non-quantitative treatment limitations. *See generally* 29 U.S.C. §§ 1185a and 2590.712(c)(3)–(4).

253.   Mayo and Medica imposed conditions on the receipt of mental health and substance use disorder benefits that were more restrictive than conditions imposed on medical/surgical benefits offered under the relevant Plans. When Ms. Orrison contacted Mayo's HR department seeking mental health and substance use care for her minor son, she was referred only to Mayo's Employee Assistance program.

254.   Given the absence of Tier 1 mental health and substance use service providers, Ms. Orrison was forced to seek pediatric mental health and substance use treatment from out-of-network providers, which effectively imposed higher copays, coinsurance, deductibles, out-of-pocket maximums, and out-of-pocket costs generally on mental health and substance use treatment under the relevant Plans as compared to medical/surgical benefits under the same Plans.

255.    Under 29 C.F.R. § 2590.712(d)(2), "[t]he reason for any denial under a group health plan (or health insurance coverage offered in connection with such plan) of reimbursement or payment for services with respect to mental health or substance use disorder benefits in the case of any participant or beneficiary must be made available by the plan administrator (or the health insurance issuer offering such coverage) to the participant or beneficiary in a form and manner consistent with the requirements of § 2560.503–1 of this chapter for group health plans."

256.    Over the relevant period, Mayo and Medica failed to make available to Ms. Orrison the reason for denying reimbursement and/or payment for the treatment her son received with respect to mental health and substance use disorder, violating the terms of 29 C.F.R. § 2590.712(d)(2).

257.    The violations of MHPAEA by Mayo and Medica give the Plaintiff and the Class the right to obtain appropriate equitable remedies as provided under 29 U.S.C. § 1132(a)(3), including, but not limited to:

(a) a declaration that the actions of the Defendants violate MHPAEA;

(b) an injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) an order requiring the reformation the network tier design utilized by Mayo and Medica to ensure compliance with MHPAEA;

(d) an order requiring disgorgement of funds obtained or retained by the Defendants as a result of their violations of MHPAEA;

63

(e) an order requiring an accounting by Defendants of the funds wrongly obtained from participants and beneficiaries of the relevant Plans as a result of Defendants' violation of MHPAEA;

(f) an order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying Plaintiff and the Class's claims in violation of MHPAEA; and

(h) an order providing restitution from Defendants to Plaintiff and the Class for their losses arising out of Defendants' violations of MHPAEA.

258.    In addition, Plaintiffs are entitled to an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## COUNT VIII
### Claim for Violation of No Surprises Act under 29 U.S.C. § 1132(a)(3)
### (On Behalf of Plaintiff and the Class Against Mayo and Medica)

259.    Plaintiffs and the Class hereby repeat and reassert the General and Class allegations as if fully set forth herein.

260.    Patients rely on provider directories to find in-network providers or determine if a particular provider is in a plan's network. Erroneous information in the directories often leads to delays in getting care, frustration, inability to access a participating provider that has available appointments, and accidental use of an out-of-network provider. In an effort to address these issues, the No Surprises Act, which went into effect on January 1, 2022, requires health plans to maintain accurate provider directory information. *See generally* 29 U.S.C. §§ 1185e, 1185i.

261.    Under 29 U.S.C. § 1185i(a)(4), group health plans and health insurance issuers offering group health insurance coverage are required to maintain "a database on the public

64

website of such plan or issuer that contains . . . a list of each health care provider and health care facility with which such plan or such issuer has a direct or indirect contractual relationship for furnishing items and services under such plan or such coverage . . . [and] provider directory information with respect to each such provider and facility."

262.    During the relevant time period, Mayo and Medica failed to provide an accurate database pursuant to 29 U.S.C. § 1185i(a)(4). Likewise, Mayo and Medica failed to implement a verification process pursuant to § 1185i(a)(2), which is designed to ensure group health plans and health insurance issuers maintain an accurate database in accordance with § 1185i(a)(4).

263.    Mayo and Medica failed to implement and/or abide by a response protocol pursuant to § 1185i(a)(3). As alleged herein, Mayo and Medica failed to provide a timely response to participants and beneficiaries of the relevant plans who requested "information through a telephone call or electronic, web-based, or Internet-based means on whether a health care provider or health care facility ha[d] a contractual relationship to furnish items and services under such plan or such coverage." 29 U.S.C. § 1185i(a)(3).

264.    Plaintiff and Class relied to their detriment on the inaccurate provider database maintained by Mayo and Medica over the relevant period.

265.    The violations of the No Surprises Act by Mayo and Medica give Plaintiff and the Class the right to obtain appropriate equitable remedies as provided under 29 U.S.C. § 1132(a)(3), including, but not limited to:

> (a) A declaration that the actions of the Defendants violate the No Surprises Act;
>
> (b) An injunction ordering the Defendants to cease violating the No Surprises Act and requiring compliance with the statute;

65

(c) An order requiring disgorgement of funds obtained or retained by the Defendants as a result of their violations of the No Surprises Act;

(d) An order requiring an accounting by Defendants of the funds wrongly obtained from participants and beneficiaries of the relevant plans as a result of Defendants' violation of the No Surprises Act;

(e) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(f) An order equitably estopping the Defendants from denying Plaintiff and the Class's claims in violation of the No Surprises Act; and

(g) An order providing restitution from Defendants to Plaintiff and the Class for their losses arising out of Defendants' violations of the No Surprises Act.

266. In addition, Plaintiffs are entitled to an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## COUNT XI
### Claim for Other Appropriate Equitable Relief
### (On Behalf of Plaintiff and the Class Against Mayo and Medica)

267. The General and Class Allegations are hereby repeated as if fully set forth herein.

268. Plaintiff brings this count on her own behalf and on behalf of the putative class, pursuant to 29 U.S.C. § 1132(a)(3)(B), only to the extent the Court finds that the equitable relief sought to remedy Counts III through VI are unavailable pursuant to 29 U.S.C. § 1132(a)(1)(B).

269. The Plaintiff and the Class have paid and owe excessive balance bills as the result of Mayo and Medica's underpayment. The difference between the appropriate

66

payment based on the NNPRA rate and the amount that Mayo and Medica actually paid is a clear benefit that Plaintiff and the Class have conferred upon Mayo and Medica because they paid monies out of their own pocket that Mayo and Medica were obligated to pay.

270.    Mayo and Medica retained this benefit failing to reimburse the over-payments made by Plaintiff and the Class.

271.    Plaintiff and the Class are owed payments from Mayo and Medica as Plaintiff and the Class were forced to pay their providers for Mayo and Medica's shortfall.

272.    Mayo and Medica has improperly retained the monies it should have paid for the claims at issue in this cause of action.

273.    It is inequitable to permit Mayo and Medica to retain these benefits.

274.    As described in detail supra, the Plaintiff and the Class relied upon Mayo and Medica's assertion in the Plan documents and reiterated during lengthy and comprehensive verification of benefits calls that out-of-network claims, when covered, would be paid at the NNPRA rate.

275.    Coverage is not in dispute or at issue for these claims.

276.    The payment rate of a claim is very material to a patient making decisions about where to seek treatment.

277.    As to reasonable reliance, it is reasonable for Mayo and Medica's insureds to rely upon the representations Mayo and Medica makes in Plan documents and that its agents make during the lengthy verification of benefits calls.

278.    It is also reasonable for Mayo and Medica's insureds to rely upon the EOBs and other written correspondence that they received from and on behalf of Mayo and Medica.

279.     It is also reasonable for Mayo and Medica's insureds to rely on the Medica Search Portal to determine whether in-network health services are available in their geographic area.

280.     Detrimental reliance is clear, the Plaintiff and the Class relied upon Mayo and Medica's representations that reimbursement would be made at the NNPRA rate. Mayo and Medica's failure to reimburse at a disclosed NNPRA rate caused Plaintiff and the Class to spend their own money to make up for Mayo and Medica's underpayments.

281.     Plaintiff and the Class also detrimentally relied on Medica's Search Portal identifying no health services in the geographic area before engaging out-of-network health services. Mayo and Medica then claimed that in-network providers were available and only reimbursed at NNPRA rates, leaving Plaintiff and the Class responsible for unreasonably large out-of-pocket expenses.

282.   Plaintiff and the Class have been harmed, and are likely to be harmed in the future, by Defendants' actions and are entitled to appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)(B).

## JURY TRIAL DEMAND

Plaintiff, on her own behalf and on behalf of the Class, demand a jury trial for all claims so triable.

**WHEREFORE**, Plaintiff, on her own behalf and on behalf of the Class, pray for judgment against the Defendants as follows:

a.   certifying the Class and their claims, as set forth in this Complaint, for class treatment;

b.   appointing the Plaintiffs as Class Representatives for the Class;

c.   designating the law firm of McCune Law Group, as counsel for the Class;

d.  for general, special, restitutionary, and compensatory damages in an amount according to proof;

e.  for treble damages for those claims arising under the Federal RICO Act;

f.  for prejudgment interest on amounts benefits wrongfully withheld;

g.  injunctive and equitable relief enjoining Defendants from the conduct alleged herein and/or other appropriate equitable relief;

h.  injunctive relief allowing class members to change their current health Plan if impacted by the inaccurate and undisclosed Plan information;

i.  declaring that Medica's payments were improper underpayments;

j.  declaring that Medica's payment methodologies were and are improper;

k.  declaring that Mayo and Medica have engaged in an illegal, prohibited, RICO enterprise;

l.  ordering Medica to reprocess all underpaid claims using an appropriate methodology;

m.  ordering Mayo and Medica to provide transparency as to the methodology applied in reprocessing claims and that the methodology be approved by the Court;

n.  for attorney's fees and costs pursuant to statute; and

o.  for such other and further relief as the Court may deem appropriate, including but not limited to awarding a surcharge, disgorging Defendants unjust enrichments from their wrongful conduct.

Dated: August 19, 2024,                                 McCune Law Group, APC


By:  _____
     Dana R. Vogel, Esq. (pro hac vice)
     drv@mccunewright.com
     Christopher M. Sloot, Esq. (pro hac vice)
     cms@mccunewright.com
     2415 East Camelback Road, Suite 850
     Phoenix, AZ 85016


69

Telephone: (520) 210-5558
Facsimile: (909) 557-1275
Joseph A. Larson Law Firm, PLLC
Joseph A. Larson, Esq. (MN #390522)
jlarson@joelarsonlaw.com
310 4th Avenue South, Suite 5010
Minneapolis, MN 55415
Telephone: (612) 206-3704
Facsimile: (612) 284-8716

*Attorneys for Plaintiff*